**176** KENTUCKY REPORTS. [Vol. 115

Pittsburg, C. C. & St. L. Ry. Co. and Others v. Dodd & Others.

CASE 25—ACTION BY JOHN L. DODD AND OTHERS, MINORITY STOCK-
HOLDERS IN THE LOUISVILLE BRIDGE COMPANY AGAINST THE
BRIDGE CO., L. & N. R. R. CO., JEFFERSONVILLE, MADISON & IN-
DIANAPOLIS R. R. CO., B. & O. S. W., AS SUCCESSOR OF THE O.
& M. R. R. CO., AND THE P. C. C. & ST. L. R. R. CO., TO COM-
PEL THE RAILROADS NAMED TO PROVIDE, AND THE BRIDGE COMPANY
TO COLLECT FROM THEM A SUM SUFFICIENT TO PAY THE DEFICIT
IN CERTAIN DIVIDENDS, AND FOR BREACH OF CONTRACT.—MARCH 19.

# Pittsburg, C., C. & St. L. Ry. Co. and Others v. Dodd and Others.

APPEAL FROM JEFFERSON CIRCUIT COURT, CHANCERY DIVISION.

JUDGMENT FOR PLAINTIFFS FOR PART OF THEIR DEMAND AND DEFEND-
ANTS APPEAL, AND FILE CROSS APPEAL. AFFIRMED ON CROSS AP-
PEAL AND REVERSED ON DEFENDANTS' APPEAL.

CORPORATIONS—MINORITY OF STOCKHOLDERS—RIGHT TO SUE—CON-
TRACTS—CONSTRUCTION BY PARTIES—MODIFICATION—USE OF RAIL-
ROAD BRIDGE—TOLLS ON TONNAGE—REBATES—DISTRIBUTION.

Held: 1. In a suit by the minority stockholders of a corporation
to enforce the corporation's contract with another corporation,
it was alleged that the majority stockholders of the plaintiff
corporation, who were also its officers, and directors, were the
majority stockholders, officers, and directors of the defendant
corporation, which was deriving such large pecuniary benefits
from its breach of the contract that the majority stockholders
of plaintiff corporation, owing to their interest in defendant
corporation, after being requested so to do, would not sue, as
was their duty, to enforce the contract. HELD sufficient to en-
title the minority stockholders to sue.

2. It appearing that under the same contract a third corporation had
the same rights and had been guilty of the same breaches as de-
fendant corporation, so that a suit against this third corpora-
tion would, if successful, establish the liability of defendant
corporation, the minority stockholders were entitled to maintain
suit against the third corporation, also, though none of its
officers or directors had any connection with the third cor-
poration.

3 A corporation owning a railroad bridge contracted with various
railroad companies to allow them to use the bridge in consid-

Pittsburg, C. C. & St. L. Ry. Co. and Others v. Dodd & Others.

eration of a sufficient payment annually to produce a four per cent., semi-annual dividend on the bridge company's stock, and provide a fund for the liquidation of its bonded indebtedness on maturity. After complying with the contract for some time, the railroad companies claimed that the charges were heavier than the traffic would bear, and threatened to withdraw from the contract if a reduction were not made. The railroad companies then provided only three per cent. dividends, which the stockholders of the bridge company received for nineteen years without demanding more. HELD, that there was a modification of the contract.

4. In an action by minority stockholders of a corporation owning a railroad bridge against certain railroads using the bridge to recover capital stock of the bridge company alleged to have been wrongfully appropriated by the railroad companies, evidence considered, and HELD to show no misappropriation.

5. A corporation owning a railroad bridge contracted to allow certain railroad companies to use the bridges in consideration of, among other things, the payment by the railroad companies for all necessary repairs and expenses of maintaining the bridge. Many years after the contract was made, increasing traffic in a canal crossed by the bridge, and regulations of the war department, required the construction of a new draw span and fender piers, which could not have been required by any conditions existing or in the contemplation of the parties when the contract was made. HELD, that the draw span and piers were not improvements for which the railroad companies were liable under the contract.

6. The approach to a bridge is a part thereof, so that an attempted conveyance by a company chartered to build and operate a bridge of an approach thereto is *ultra vires*.

7. The directors of a corporation owning a railroad bridge conveyed an approach to the bridge to a railroad company, which was using the bridge by agreement. The conveyance was without consent of the stockholders, and *ultra vires*. HELD, that as the deed was void, and the possession of the railroad company was, in effect, that of a tenant, limitations was no defense in an action by the bridge company to recover the approach.

8. Certain railroad companies contracted for the use of a bridge belonging to an independent corporation, the contract providing that they should pay tolls, which "shall not be in excess of a charge sufficient to produce in the aggregate a sum equal to the expense of keeping the bridge in repair and paying a dividend of four per cent. semi-annually on the capital stock of the bridge company." This was afterwards modified so as to call

178            KENTUCKY REPORTS.            [Vol. 115

Pittsburg, C. C. & St. L. Ry. Co. and Others v. Dodd & Others.

for three per cent. semi-annual dividends, and thereafter, for twenty-four years the railroad companies paid enough to furnish such dividends. HELD, a construction of the contract by the parties, so as to require the railroads during the life of the contract, to furnish three per cent. dividends, though the contract merely provided, that they should not be required to pay "to exceed" that percentage.

9. Certain railroad companies contracted for the use of a railroad bridge belonging to an independent corporation, agreeing to pay each year a sum sufficient to pay the expenses of the bridge, and a certain dividend on the bridge company's capital stock. To provide this sum, all the railroads paid a certain charge on their tonnage crossing the bridge, and at the end of the year the bridge company returned as rebates the excess of the sum paid in over that required. One road connecting with the bridge at one end delivered to and received from the other roads all its tonnage passing over the bridge, and in its accounts with the other roads was charged with tolls on all such tonnage. but the annual rebates were paid to the connecting roads. This road sued the bridge company for the rebate, and recovered judgment; the bridge company defending the suit in the interest and at the request of the connecting roads. The bridge company appealed, superseding the judgment. The judgment was affirmed, with ten per cent. damages against the bridge company. Pending the suit and appeal, considerable sums of interest had accrued, which, together with the judgment and costs, the bridge company paid. HELD, that the connecting roads were liable to the bridge company not only for the amount of the judgment, but for the damages, interest, and costs.

10. It appearing that two of the connecting lines had become insolvent after the suit against the bridge company, the amounts due from them in satisfaction of the judgment, interest, and costs could not be collected from the other roads, but was the loss of the bridge company.

11. When a contract between a bridge company and railroads using the bridge provided that it might be terminated by any of the parties by giving two years' notice, such a notice, acted on by both the parties, terminated the contract, though the railroad continued to use the bridge on the terms provided in the contract.

HELM, BRUCE & HELM, FOR APPELLANTS.

(The brief of the attorneys for appellants being very elaborate, the reporter finds it difficult to condense it without taking up too much space, and as there is no brief in the record by

Pittsburg, C. C. & St. L. Ry. Co. and Others v. Dodd & Others.

the appellees will only give the conclusions of the attorney and authorities cited.)

In conclusion we submit that we have shown:

1. That the judgment against the appellants is erroneous in all of the respects complained of.

2. That the stockholders in this case have no right to maintain the suit, because there has been a total failure to show that the acts complained of were either *ultra vires* or fraudulent.

3. That even if they had been fraudulent, most of the acts committed occurred prior to the time when the plaintiffs acquired their stock.

That appellees have been guilty of such gross laches in waiting until all the principal parties are dead, and in now seeking to undo transactions consummated from fifteen to thirty years ago, they will not receive the aid of a court of equity.

5. That their various claims, except their claims for dividends on the basis of eight per cent., are all barred by limitation, and so far as their claim for a dividend deficit on a basis of eight per cent. is concerned, appellants are not in default, nor are they responsible for the defaults of other railroad companies.

We respectfully ask that the judgment be reversed with directions to dismiss the petition.

### AUTHORITIES CITED.

Construction of contract involved. Louisville Bridge Co. v. Louisville & Nashville Railroad Co., 21 Ky. Law Rep., 272.

Unless pleadings support judgment, it is void. Allsmiller v. Freutchenicht, 86 Ky., 198.

Ten years' statute applying to every case not specifically provided for, applicable to this case, if other statutes cited are not. Allen v. Froman, 96 Ky., 316; Wright v. Gardner, 98 Ky., 460.

Who so seeks equity must do equity. Louisville Water Company v. Hamilton, Sheriff, 81 Ky., 517; Clark v. Water Co., 90 Ky., 524.

Court of equity no jurisdiction to entertain suit of minority stockholders unless acts complained of are either *ultra vires* or dishonest. Cooke on Stockholders, secs. 683-4; Morawetz on Private Corporations, sec. 243; Hawes v. Oakland, 104 U. S., 450, reviewing English and American cases; Shaw v. Davis, 78 Md., 308; S. C., 28, Atl. Rep., 619; 23 L. R. A., 294; North American Land & Timber Co. v. Watkins, 109 Fed. Rep., 105.

Minority stockholders can not force corporation into litigation deemed unwise by the majority, so long as the directors

Pittsburg, C. C. & St. L. Ry. Co. and Others v. Dodd & Others.

act in good faith and the acts of the corporation are *intra vires*. Cooke on Corporations, sec. 750; Slattery v. St. L. & N. O. Transportation Co., 91 Mo., 217; Louisville Trust Co. v. L., N. A. & C., 75 Fed. Rep., 449; Hoyt v. Thompson, 19 N. Y., 216; R. R. Co. v. Alling, 99 U. S., 463.

Owners of stock acquired subsequent to the act complained of have no standing in court. Hawes v. Oakland, 104 U. S., 450; Dimpfell v. O. & M., 110 U. S., 210; Alexander v. Searcy, 81 Ga., 536; Moore v. Sylvester Mining Co., 104 N. C., 534.

Laches. Cooke on Corporations, secs. 728 and 729; Morawetz, sec. 630; Johnson v. Standard Mining Co., 148 U. S., 370; Hammond v. Hopkins, 143 U. S., 250; Mackall v. Casilear, 137 U. S., 566; Johnson v. West India Transit Co., 156 U. S., 646; Lansdale v. Smith, 106 U. S., 219; Speidell v. Henrici, 120 U. S., 377; Brown v. Buena Vista, 106 U. S., 168; Richards v. McCall, 124 U. S., 183; Credit Co. v. Ark Cent., 15 Fed. Rep., 46; St. Paul v. Sage, 49 Fed. Rep., 324; Snow v. Boston, 33 N. E. Rep., 538; Pinnis v. Minnesota, etc., 67 N. W. Rep., 644; Cullen v. Coal Creek Mining & Mfg. Co., 42 S. W. Rep., 697.

Limitation. Kentucky Statutes, secs. 2515, 2519, 2522; Robinson v. Elam, 90 Ky., 300.

J. C. DODD, HARRIS & MARSHALL, KOHN, BAIRD & SPINDLE, AND HAZELRIGG & CHENAULT, FOR APPELLEES.

(No briefs for appellees.)

OPINION OF THE COURT BY JUDGE O'REAR, AFFIRMING IN CROSS APPEAL AND REVERSING ON DEFENDANTS' APPEAL.

The Louisville Bridge Company was incorporated by an act of the Legislature in 1856, with authority to build a railroad toll bridge across the Ohio river at Louisville. The bridge was not built and completed till about 1870. The charter of the bridge company authorized it "to contract, at an agreed sum or rate, with any railroad company chartered by the State of Kentucky, or any other State of the United States, for the annual use of said bridge by the cars or for the purposes of said railroad company."

This bridge was built from stock subscriptions and the proceeds of an issue of mortgage bonds. The capital stock paid in was $1,500,000. The bond issue was $800,000. When

this bridge was built there was no other railroad bridge across the Ohio river below Cincinnati. Then the only railroad connecting with it from the south was appellant Louisville & Nashville Railroad. The only railroads connecting from the north were the Jeffersonville, Madison & Indianapolis Railroad and the Ohio & Mississippi Railway (the latter by way of using the approach owned by the former). The bridge was constructed exclusively for railroad traffic. The bridge company owned no rolling stock, and has never owned or operated any.

On June 5, 1872, the Louisville Bridge Company (hereinafter referred to as the "Bridge Company"), the Jeffersonville, Madison & Indianapolis Railroad Company, the Ohio & Mississippi Railway Company, and the Louisville & Nashville Railroad Company entered into a contract—perpetual, except as it might be terminated by the parties according to its terms—by which the railroad companies agreed to pass over the bridge their traffic destined to cross the Ohio river at or near Louisville, and to pay for this privilege such rates per engine, per car, per ton, and per passenger as the bridge company might from time to time fix, not exceeding in the aggregate a sum sufficient to pay a certain fixed income to its stockholders, and taxes, cost of operating expenses, and the maintenance of the bridge company's organization. It was not agreed, and could not have been, by the bridge company, that the contracting railroads were to have the exclusive right of passage over the bridge. On the contrary, it was expressly stipulated that the bridge company might admit any other railroad or railroads to the same privileges as by the contract were accorded to the then contracting roads, but upon terms no more favorable. As this contract is at the foundation of this litiga-

tion, and its construction and application are involved, it is set out at length:

"Agreement made this fifth day of June, 1872, between the Louisville Bridge Company, party of the first part, the Jeffersonville, Madison & Indianapolis Railroad Company, party of the second part, the Ohio & Mississippi Railway Company, party of the third part, and the Louisville & Nashville Railroad Company, party of the fourth part, witnesseth:

"Whereas, the first party owns the bridge over the Ohio river at Louisville, between the Commonwealth of Kentucky and the State of Indiana, with the approach thereto on the south or Kentucky side thereof, its capital stock being fifteen hundred thousand dollars, and its mortgage debt eight hundred thousand dollars, bonds for said debt being issued for one thousand dollars each, dated the first day of December, 1868, and payable twenty years after said date with interest at seven per cent. per annum, payable semiannually in gold on the first day of June and the first day of December, principal and interest payable at the Bank of America, New York City. And, whereas, the second party owns the approach to said bridge on the north or Indiana side thereof and the railroad connecting therewith; and, whereas, the third party owns a railroad connecting with the railroad of the party of the second part at or near the north end of said approach; and, whereas, the party of the fourth part owns a railroad terminating in the city of Louisville and connecting with the track over and across the said bridge.

"Now this agreement witnesseth: In consideration that the second, third and fourth parties agree respectively to use said bridge as is hereinafter covenanted, the first party hereby covenants and agrees jointly and severally with the

second, third and fourth parties, their successors and assigns respectively, that the tolls and charges over and for the use of said bridge and its tracks, owned by the first party, in the transportation of freights, passengers, mails and other goods received from or delivered to the roads of said second, third and fourth parties, per ton, and per passenger or per car, engine or other means of transfer over said bridge, shall be fixed on signing this agreement, and shall not be in excess of a toll or charge sufficient to produce in the aggregate a sum equal to the cost and expense of keeping in repair and taking care of said bridge and the said approach owned by the first party—paying a dividend semiannually of six per cent. on said capital stock of fifteen hundred thousand dollars, the interest upon the said fund sufficient to pay off said bonds of eight hundred thousand dollars at maturity, the amount necessary to keep up the corporate organization of the party of the first part, with its proper officers and servants, and such taxes as may be chargeable against such bridge company on said bridge or other property pertaining thereto or otherwise; and it is understood and mutually agreed that said charges and tolls shall from year to year be reduced in proportion to the reduction of interest on said bonds by the operation of said sinking fund; and that said tolls and charges shall always be the same to each of the second, third and fourth parties, and that the tolls and charges to other railroad companies for like use of said bridge and the approach owned by the first party shall not be less than those charged to or incurred by the parties hereto. And all such tolls and charges paid by other railroads or railroad companies shall be applied to and form a part of the fund hereinbefore provided for the payment of expenses, sinking fund, inter-

184          KENTUCKY REPORTS.          [Vol. 115

Pittsburg, C. C. & St. L. Ry. Co. and Others v. Dodd & Others.

est, dividends and taxes the same as if paid by the second, third and fourth parties.

"Sec. 2. The first party shall keep in repair, maintain and renew the said bridge and its appurtenances, and the tracks and approach thereto owned by the first party. If, however, said bridge or its appurtenances shall be injured by floods, ice, or other casualty, or by crystallization of the iron, or other inherent decay, so as to render same useless or dangerous, and it shall become necessary to rebuild the whole, or any material part thereof, involving an expenditure greater than could be realized from a judicious amount of current rates and charges, then, and in every such case, it is mutually agreed between the parties that the first party shall issue bonds, secured by mortgage on said bridge and its appurtenances and appendages, owned by the first party, at a rate of interest not exceeding seven per cent. per annum in gold, payable semi-annually, principal payable in forty years, and to an amount sufficient to yield a fund equal to the expenses of renewing and repairing said bridge, and the proceeds of said bonds shall be applied to that purpose, in which event the tolls and charges for the use of said bridge, as hereinbefore provided, shall be increased so as to cover and provide for the payment of the interest on said bonds, and a sinking fund to retire and take up said bonds at maturity.

"Sec. 3. In consideration of the premises, the second and third parties each severally covenant for itself, its successors and assigns with the first party, its successors and assigns, that it will pass over the said bridge all the freight, passengers, mails, express matter, and other goods carried on and over their roads to and from Louisville, and to and from points which require their passage over the Ohio river at or near Louisville during the existence of this agree-

ment, and will pay punctually to the party of the first part the tolls and charges hereinbefore provided for the use by them respectively of said bridge and the tracks and approaches thereto, owned by the first party; and the party of the fourth part for itself, its successors and assigns, covenants with each of the parties of the first, second and third parts, their respective successors or assigns, that it will deliver to said party of the first part, to be passed over said bridge, or to the parties of the second and third parts, or to such other railroad company or companies as may for the time being be transporting freight, passengers, mails, express matter and other goods over the said bridge, all the freight, passengers, mail, express matter, and other goods carried on and over its road or any part thereof, destined for Jeffersonville, in the State of Indiana, or any other points which require their passage over the Ohio river at or near Louisville, during the existence of this agreement, and will charge on such traffic, in addition to its rates for transportation service, the then established rates of toll and charges hereinbefore provided for the use of said bridge and approaches, and punctually pay the said tolls and charges to the first party.

"Sec. 4. In consideration of the premises aforesaid, and in consideration of the ownership and investment made by the second party in, and its control of, said approach to said bridge at the north end thereof, the third party hereby covenants and agrees with the second party, to use said approach to said bridge, from the existing point of connection between their respective roads, or such other point as may hereafter be agreed on by the said two parties in going to and from said bridge with the cars, engines and trains, or other means of transporting freight, passengers, mails, express and other goods over its railroad, destined

to and from Louisville, and to or from points at or near Louisville during the existence of this agreement. It is, however, mutually understood and agreed that all of the said trains, cars and engines, passing over said approach and over said bridge, are and shall be, under the control and direction of the second party, and that whatever rules are prescribed for the government of the trains, cars and engines of the second party in the premises, shall be equally applicable to the trains, cars and engines of the third party, each being dealt with alike. It is, however, further mutually understood and agreed between the second and third parties, that so long as the passenger trains of the party of the second part are run to and from said city of Louisville with the proper train engines of the second party, the passenger trains of the third party may also be so run by its own proper train engines. But whenever, in the opinion of the second party, the trains of the parties can not be so run with safety, the second party shall set apart a sufficient number of engines for that service. The freight trains and freight cars of the parties shall be run over said approach and said bridge, to and from Louisville, with the engines of the second party set apart for that service, and the second party hereby covenants to furnish all needful and sufficient engines for the service hereinabove mentioned, and at all times to transfer with the same promptness and care, over the said approach and bridge, the trains, cars, engines and traffic of the parties of the third and fourth parts, received from or to be delivered to the roads of the parties of the third and fourth parts that it does the trains, cars, engines and traffic received from or to be delivered to its own road; the intention being that each of the parties shall enjoy equal facilities over said approach and bridge.

"For the services aforesaid of the said engines of the second party, and the conducting and management of the same, and of the cars, trains and business over said approach and bridge, the second party shall be allowed a reasonable compensation, to be fixed on signing this agreement, to be apportioned between the parties hereto in proportion to the service to each, per ton and per passenger, or per car, engine or other means of transfer, as the parties may hereafter agree.

"In respect to the use by the third party of the approach to said bridge, owned by the second party, on the north side of said bridge from the point of connection made therewith by the third party the party of the third part hereby covenants and agree to pay the second party five per cent. per annum on the actual cost of the right of way, the construction of the same and the value of the superstructure thereon, which cost and value are together assumed at —— dollars, and also pay in proportion to use the expenses of keeping up and maintaining and renewing the same. If any of the parties hereto, and in interest, cannot agree as to the compensation or rule of apportionment for said engine service and management of trains, or upon the expense or rule of apportionment of the expenses relating to said approach, or the cost and value of said roadway and track as above provided then each of the two parties in interest may select one referee to determine the difference, and if said referees can not agree, an umpire may be chosen by them, and their decision, or a majority, shall conclude the matter. If either party fail to appoint a referee as aforesaid within thirty days after written notice to make such appointment, the referee appointed by the party not in default shall appoint the referee for the defaulting party, and the two shall proceed to determine the matter or ap-

point an umpire. No person shall be qualified to act as umpire or referee except disinterested persons of experience and skill in railroad management. The parties mutually covenant to perform the awards.

Any of said parties in interest, after the expiration of six months from the time such agreement for said compensation for said services and expenses is made, or six months after such award, may then and semi-annually thereafter, upon thirty days' previous notice in writing to the other party in interest, require said compensation to be readjusted, and if they can not agree upon the terms of such readjustment, the same may be referred to and determined by arbitrators as hereinbefore provided; but no readjustment shall be made of the rate of interest to be paid for the cost of such approach to said bridge.

"Sec. 5. Accounts of all expenditures, tolls and charges and payments required by the terms of this agreement shall be kept by the party authorized by this agreement to charge the same against either of the parties hereto. The account of tolls, however, to be kept by the respective parties chargeable therewith, and all such accounts shall be rendered to the proper parties during the month next succeeding the accruing of the items thereof, and the same shall be settled and paid within thirty days after the rendition of each monthly account.

"Sec. 6. If it is found during the month of May or November in any year that the tolls and charges herein provided are not sufficient to meet the said interest and dividend due the first day of the next succeeding month, the parties of the second and third parts each covenant and agree separately with the first party, and mutually covenant each with the other to advance and pay the deficit immediately, and prorate according to the aggregate amount

of tolls and charges for the use of said bridge against each for the then current six months. The said advance, with interest thereon at the rate of seven per cent. per annum, shall be refunded by the first party out of the tolls first thereafter accruing.

"Sec. 7. This agreement shall take effect on the first day of July, A. D. 1872, and the first semi-annual interest on said mortgage bonds of the first party and the first semi-annual dividend on the capital stock of the first party, provided for by this agreement, shall be payable on the first day of December, A. D. 1872, and the first of January, A. D. 1873, respectively, and semi-annually thereafter. If any difference shall arise between the parties or any of them as to the construction of any of the provisions of this contract of the mode of performance, the same shall be submitted to arbitrators the qualification of arbitrators and an umpire, and the obligation to perform the award by them made, to be the same as hereinbefore provided in section four.

"This contract shall continue in force and in operation until it shall be terminated by some one of the parties thereto giving notice in writing to the other parties of its election to terminate the same at the expiration of two years from the giving of such notice, at the expiration of which two years the same shall terminate as to all the parties thereto included in such notice.

"In witness whereof, each of the parties has hereto set its corporate seal, and has caused these presents to be duly signed by its president, the day and year first before mentioned. [signed.]"

In 1882 two other roads were admitted by the bridge company upon terms substantially identical, save as to amount of dividends to be provided for stockholders (the

rate being in these contracts stated at 8 per cent., payable semi-annually); being the Louisville, New Albany & Chicago Railway Company (in the record called the "Monon," and the Louisville, Evansville & St. Louis Railroad Company (called the "Air Line"). Since 1877 the bridge company has exacted, and the railroads have provided, only 8 per cent., payable semi-annually, as a fund for dividends to stockholders upon the capital stock of $1,500,000. The Ohio & Mississippi Railway Company has long since ceased to use the bridge under the contract, having availed itself of the privilege to terminate its connection upon notice as is herein provided. The Jeffersonville, Madison & Indianapolis road has, by lease and consolidation, become a part of, and is now operated as, the Pittsburg, Cincinnati, Chicago & St. Louis Railway Company (in the record called the "Pan Handle"); the latter having taken over the property of the former, and assumed its place under the contract in suit. The Louisville, New Albany & Chicago Railway has, by insolvency, changed hands, and is now operated by the Chicago, Indianapolis & Louisville Railroad Company. The latter is not, and has not been, a party to the contract sued on.

In 1896, because of lack of funds, the bridge company reduced its dividends from 4 per cent., due for the first half of that year, to 2 ½ per cent., and for the year 1897 they were reduced to 3 per cent. semi-annually, and a similar reduction for the year 1898. No dividend was declared for the first half of 1899.

This suit is by appellee John L. Dodd and others, representing about 700 shares of the capital stock in the bridge company, out of an issue of 15,000 shares, against the bridge company, the Louisville & Nashville Railroad Company, and the Jeffersonville, Madison & Indianapolis Rail-

road Company (the Baltimore, Ohio & South Western, as successor of Ohio & Mississippi Railroad Company, sued, but not involved on this appeal), and the Pittsburg, Cincinnati, Chicago & St. Louis Railroad Company, to compel the railroads named to provide, and the bridge company to collect from them, a sum sufficient to pay the deficit in dividends just mentioned. It is also alleged that the contracting railroads have otherwise broken their contracts, in failing to pay all the taxes assessed against the bridge, and were then in default on that account about $200,000 to the city of Louisville, and that the railroad companies had illegally and fraudulently distributed and appropriated among themselves about $108,000 of property, constituting that much of the capital of the bridge company, and for other alleged derelictions, all of which will be particularly noticed and treated of below. The plaintiffs sued for not only the deficits above named, but claimed that they should be paid 12 per cent. for all the time since 1877, and interest on the deficits. In fine their claims are as follows:

1. For deficit in 6 per cent. dividends, semi-
annual, and interest.................... $2,239,875 00
2. Capital appropriated, with interest......    443,842 36
3. To have reconveyed to the bridge company
a lot of 10½ acres of land, on which is
built the northern approach to the
bridge.
4. Taxes due by the bridge company.......    200,002 23
                                        _____
Total (not valuing the 10½ acres of
land) ........................... $2,882,720 02

The record made up, comprising several thousand pages, is unnecessarily large, for there is little or no dispute concerning the facts. The principal controversies over the

facts relate to their application or interpretation.   Indeed,
no witness is living who participated in the execution of
the contract—at least, none is introduced or mentioned as
living.   The method of dealings between the railroads and
the bridge company from the making of the contract are
shown principally by the books kept by the bridge com-
pany.   There are but few provisions of this contract which
have not been either altered by agreement or long acqui-
escence of the parties, or by construction placed upon it
and carried into effect in innumerable and almost daily
transactions for nearly 25 years; making it to read, as thus
altered and practically construed, different from what would
probably have been the judicial interpretation of the terms
of the instrument as a matter of original impression.

This suit is brought by the minority stockholders of the
bridge company because they aver that the directors of the
company refuse to sue to redress the grievances to the com-
pany complained of, and will not and ought not to take
charge of this litigation, because of a conflict of interest
and of duties, owing to their being also directors and inter-
ested in the Pittsburg, Cincinnati, Chicago & St. Louis
Railroad Company and the Jeffersonville, Madison & In-
dianapolis Railroad Company.   The circuit court granted
plaintiffs relief in part only.   The Pittsburg, Cincinnati,
Chicago & St. Louis Railroad Company and the Louisville
& Nashville Railroad Company have appealed, and the mi-
nority stockholders, represented by the plaintiffs below,
have prosecuted a cross-appeal.

### The Right of Minority Stockholders to Maintain a Suit for the Corporation.

The first question naturally presented is the right of
minority stockholders of a corporation to maintain suit on

Pittsburg, C. C. & St. L. Ry. Co. and Others v. Dodd & Others.

its behalf. Generally, such a suit can not be so maintained. The management of a corporation's affairs, involving exercise of judgment and policy, are by law committed to a governing body, usually styled a "board of directors." Touching all things that the corporation might lawfully do, their discretion and acts are conclusively deemed to be those of the corporation. Such are called "intra vires acts." The courts neither can or should undertake to control or interfere with their exercise. But there are admitted exceptions to the general rule that the acts of the directors are the acts of the corporation, and can not be interfered with by the courts at the complaint of stockholders, which are as well established perhaps as the rule itself. If the directors have done or are about to do some act ultra vires, the suit of a minority stockholder will be entertained to prevent or redress it. Or if the directors are guilty of fraud, or are committing a breach of trust, as against the corporation, the right of the stockholder to sue is recognized in this country. Whether the fraud or breach of trust must involve moral turpitude on the part of the director, the courts do not seem to be of one mind. It is our opinion that it is much the same thing to the corporation whether the wrongful act flows from an improper motive, or from such acts themselves, so wrong in the eyes of the law, that the improper motive that is an ingredient of fraud is imputed to it.

In the case at bar the holders of the majority of the stock of the bridge company are also owners of a majority of the stock of the Pan Handle Railroad. The same votes elect the board of directors or managers of each corporation. They select the same persons to fill these places in each board. If there is a misunderstanding between the two cor-

194          KENTUCKY REPORTS.          [Vol. 115

Pittsburg, C. C. & St. L. Ry. Co. and Others v. Dodd & Others.

porations, it must be solved substantially by one and the same set of representatives, constituting complainants, defenders, and triers of the fact. The reason of the rule making the judgment of the directors that of the corporation depends in large part upon their having been selected by the stockholders as their representatives, or proxy, in that matter; that their wills being free, as would be the principals', expediency favored the recognition of their act as that of the principals, the stockholders. But where the directors can not act, and where every presumption founded in reason and ascribed by the law to their acts, is resolved at once into a doubt, the reason of the rule fails, and the rule itself must cease. The directors need not be dishonest. It is enough if their situation is such that by reason of conflict of interest they can not or should not act.

Under this application of the rule discussed, it does not follow that every contract entered into between two corporations having directors in common is void, or even that it may be set aside upon the complaint of a single stockholder for that fact alone. Roberts v. Washington Nat. Bank, 11 Wash., 550, 40 Pac., 225, and notes, 2 Am. & Eng Dec. Equity, 272-284. We go no further than to say that upon an allegation of fraud on the part of his directors, or upon an allegation of facts showing that the directors (who are also directors of another contracting corporation), because of conflict of interest and duty, could not or ought not to act in the matter, coupled with the further allegation showing material damage to the complaining stockholder by reason of the transaction between the two corporations, a court of equity will hear a single stockholder's complaint, and, if the charges be sustained by the proof, will grant appropriate relief. In this case the complaint shows a contract between two corporations having directors in common, both

dominated by the same controlling interest, and that one of them has reaped material advantage over the other because of the former's breach of the contract, which the directors of the latter refuse to sue to redress. In addition, it is charged that one corporation has actually converted over $100,000 of the capital stock of the other, as well as has caused to be conveyed to the former a material part of the corpus of the latter's property, necessary to enable it to continue to serve the public according to the intent of its charter. The latter acts, if true, are ultra vires, and under all the authorities are the proper subject of a suit for correction by a single stockholder; the others, although intra vires, and although actuated by the most honest purpose of the directors, show a state of case wherein the directors are placed in such an attitude as materially embarrasses and hinders them in giving to the settlement of the controversy either an undivided judgment or such an untrammeled service as the injured corporation is entitled to. To close the doors of the courts to a single stockholder in such a case upon the theory that the majority must rule, and that, having embarked in a common enterprise with them, he must abide the judgment of the majority, would be to turn over to a possible wrongdoer the adjudication of his own case. In such an unequal struggle between duty and interest, it would more frequently happen that "duty would be overborne in the conflict." It is clear to us that upon the allegations in the petition in this case a cause of action was shown against the Pan Handle Company.

The case of allowing the suit by minority stockholders of the bridge company against the Louisville & Nashville Railroad Company is not so free from difficulty. It is not claimed that the Louisville & Nashville Railroad Company had any part in the selection of the bridge company's di-

rectors; nor that their dealings were otherwise than at arm's length, and free from fraud, actual or constructive Nor was it shown or claimed that the Louisville & Nashville Railroad Company was under any duty whatever toward, or had any connection with, the bridge company, other than as fixed by contract. The Louisville & Nashville Railroad Company asks why may it not, under such circumstances, deal with assurance with the corporate authorities of the bridge company as other people might? We think it can. Its position, so far as the validity of its contracts and settlements with the bridge company are concerned, is distinctly different from that of the Pan Handle Company. In other words, its contractual relation and liabilities to the bridge company, in the absence of fraud, or acts of the bridge directors ultra vires, are to be considered under materially different rules from those affecting a corporation whose officers control the bridge corporation. But there is a distinction between the Louisville & Nashville Railroad Company's contract liabilities in such a case and the right of a single stockholder of the bridge company to maintain a suit on behalf of the bridge company against the Louisville & Nashville Railroad Company to have those liabilities enforced. The instance must be rare when the action by the single stockholder, under the phase now being considered, could be maintained. It will not be questioned that if the bridge company directors, through a fraudulent purpose, refused to bring the suit against the Louisville & Nashville Railroad Company to enforce its liability under the contract, the minority stockholders of the bridge company might maintain the suit on its behalf, although the Louisville & Nashville Railroad Company was not a party to the fraud. Cook on Stock and Stockholders, section 645; Dodge v. Woolsey, 18 How., 331, 15 L. Ed., 401; Rog-

ers v. Nashville, C. & St. L. R. Co., 33 C. C. A., 517, 91 Fed., 299; Mack v. DeBardelaban Co., 90 Ala., 396, 8 South, 150, 9 L. R. A., 650. Here it is charged, in substance, that the liability of the Louisville & Nashville and of the Pan Handle roads under the contract are identical; that the directors of the bridge company can not and will not bring the suit against any of the parties to the contract, because to do so would be to subject the Pan Handle Company to liability if the grounds should be sustained. Therefore, if, for improper reasons, or if discretion is benumbed by the jarring conflicting interests, the bridge directors can not bring the action against any of the parties because of the involvement of their other principal, the Pan Handle Company, certainly every sufficient reason exists for replacing the directors by the minority stockholders in the suit against all the parties for the accounting.

The court is of opinion that the cause of action set out may be maintained by the minority stockholders of the bridge company suing on its behalf, and joining it as a defendant, against all the defendants. Whether the grounds of action are sustained is another question.

Is the Bridge Company Entitled to Collect from the Contracting Railroads Tolls to Produce 6 per cent. Semiannual Dividends on its Stock, in Addition to the Other Charges Provided in Contract of June 5, 1872?

The circuit court adjudged that in 1877 the contract of June 5, 1872, had been modified by all the parties to it, so that 8 per cent. (4 per cent. semi-annually) only has since been paid by the contracting railroads for dividends upon the capital stock of the bridge company. The minority stockholders, having sued for 6 per cent. semi-annual dividends for this period, prosecute a cross-appeal from the judgment.

Unless the contract of June 5, 1872, has been modified as adjudged, the contention of appellees must be sustained. That the railroads ceased to provide, and the stockholders of the bridge company did not receive, dividends at a greater rate than 4 per cent. semi-annually since 1877, is a conceded fact. From 1877 to 1896, without interruption, and regularly, 4 per cent. dividends were supplied by the railroads, and paid over by the bridge company, and were received by its stockholders every six months. No more was exacted of the railroads. It was not claimed that any more would be exacted of them. Their monthly statements to, and quarterly settlements with, the bridge company, and the latter's annual reports to its stockholders. were all made up by the parties respectively upon that basis, and have been carried into innumerable settlements. The reason attributed by the railroads for this action is that one of the contracting roads—the Ohio & Mississippi Company—in 1875 became dissatisfied with its experience under the contract, alleging that the payment of a 6 per cent. semi-annual dividend on $1,500,000 of stock, in addition to the other charges required by the contract, was a greater burden than commerce would bear. Notice was given that the complaining road would withdraw in two years from date (June 14, 1875), "unless those tolls be at once reduced to conform with the times." The letter to the president of the bridge company, containing this notice, showed that the matter had been the subject of previous conference between the parties. The president of the bridge company testifies that this reduction in dividends was made as the result of this demand and the agitation of the question produced by and preceding it. In 1882 contracts were made between the bridge company and the Louisville, New Albany & Chicago Railroad Company and the Air Line, by which it

was stipulated that each of them was to have the same priv-
ileges as appellants, and were to be charged tolls at a rate
no greater than to produce, with all other tolls, a 4 per
cent. semi-annual dividend to stockholders, after defraying
the other corporate charges referred to. This, in connection,
with the clause in the original contract of June 5, 1872, that
no other road was to be admitted to use the bridge upon
more favorable terms than were accorded to these appel-
lants, would of itself have operated as a modification of
the original contract. Besides, the stockholders have for
more than 20 years before this suit was brought received
the reduced dividends, and suffered the matters to proceed
upon that basis without material complaint. True, plain-
tiffs claimed that they submitted to this reduction upon the
assurance of the bridge directors, officials of the Pan Han-
dle (or the Pennsylvania interests, as they are sometimes
called), to stockholders that a stock dividend would be pro-
vided in lieu of the reduced dividends, and that it would be
to their interest to yield the point, and that they did yield
upon that assurance alone. A stock dividend ought not,
and properly could not, have been declared upon any basis
other than that of an increase in value of corporate assets
justifying it. This was probable only by capitalizing that
value represented by the bonded indebtedness, after the debt
had been discharged. As the contract provided unques-
tionably for the liquidation of the bonded debt without ref-
erence to any reduction of dividends in the meantime, this
reason does not appear to us to have been either substantial
or as affording ground of action if the stockholders were
subsequently disappointed in not receiving a stock divi-
dend; for manifestly the stockholders' property, whatever
its value, is there, and their stock, be it so much or more
represents that total value. Nor can we find the fact to be

that there was an agreement by the directors and the minority stockholders to the effect that the stock dividend would be issued in consideration of the reduction of dividends. While there is evidence in the record that a stock dividend was for years contemplated as a possibility, and doubtless is yet, the agreement relied on is disputed, and by no means proved. Mr. Dodd's testimony of conversations on that subject, had with officers of the company who are now dead, can not be admitted, Mr. Dodd being one of the plaintiffs in interest and in fact. Sec. 606, Civ. Code.

It would be now impossible to equitably adjust the accounts of all interested parties upon the 12 per cent. basis. This is owing not only to the fact that a number of railroads have since been admitted to the use of the bridge on the 8 per cent. basis, and have settled their accounts and been discharged, and some have since gone out of existence, but it would probably be impossible, owing to the great lapse of time, of death and removal of witnesses, and loss of proper records, to reach a just settlement. The stockholders of necessity knew all these years of this state of affairs. They should have taken action sooner, if determined not to abide the reduction. In all probability, if the point had not been yielded at the demand of the Ohio & Mississippi Company, other contracting railroads might soon thereafter have come to the same conclusion, and availed themselves of the privilege, under the contract, of withdrawing from the bridge. The parties have so long rested upon the present status, have treated it as satisfactory and valid till such material changes in conditions and circumstances have occurred as to constitute an estoppel against them. Furthermore, in view of the changed and changing conditions, the action of the bridge company

seems to us to have been wise, and fully justified, as based upon sound business judgment and experience.

### Misappropriation of Capital Stock.

Appellees assert that appellants and the other railroad companies using the bridge under the contract referred to herein have appropriated to their own use and distributed among themselves about $108,000 of the capital stock of the bridge company. Appellants deny the charge. In addition they plead the statute of limitation (the 10-years statute), section 2519, Ky. St.

Before considering the plea of limitation, we have deemed it best to determine whether the charge was true in fact. Of the authorized capital of $1,500,000, $1,208,926 had been paid in when the railroads entered upon their contract of 1872, and took charge of the bridge. In addition, the bridge company owed a floating debt of $131,619.35 shortly before or about the time of the contract of June, 1872. This was paid off partly with the proceeds of the remainder of the capital stock, leaving a balance of $87,513.05, which was paid in some time after the railroad companies took charge of the bridge traffic. This sum seems to have been placed in the bridge company's sinking fund. In addition to that, the bridge company sold a right of way under its northern abutment in 1886 for $10,000, which was placed in the sinking fund. In 1885 the bridge company conveyed to the Jeffersonville, Madison & Indianapolis Railroad Company 10½ acres of land in Indiana (forming the subject of a distinct branch of this litigation, and treated of further along) for $10,286.91. This sum also seems to have gone into the sinking fund. These three items, making a total of $107,799.96, are the only ones that we are able

to trace as having belonged properly to capital stock that went into the sinking fund of the bridge company.

To understand how it may be worked out whether these sums have been appropriated, it is necessary to state the purpose and uses of this sinking fund, how created and supplied by the contracting railroads, and how disposed of. The contract of June 5, 1872, required the contracting railroads (including, of course, all others who subsequently came to use the bridge upon the same terms) to provide, from tolls on their traffic passing over the bridge, for discharging the interest annually of 7 per cent. per annum, and the principal of the mortgage debt of $800,000 against the bridge, due in 1888. The main thing of this matter, so far as the bridge company was concerned, was to have its property freed of the mortgage debt by the time it was due. So far as the railroads were concerned, it was to discharge this debt in the easiest way, and by the one least burdensome to their traffic. A number of experiments seem to have been tried before one was finally adopted as the permanent sinking fund scheme. In the first place, a rate, or schedule of rates, was adopted by the bridge company with the concurrence, and presumably upon an agreement with, the railroads, by which it was thought and estimated that the fixed and current charges under the contract would be met. It is plain that the railroad companies were interested in keeping the bridge tariffs down to a minimum figure, because they were a charge upon their business, and necessarily affected the ability of the roads to get the traffic. The problem was to arrange a schedule of bridge tolls in advance, so that surely enough, but no more than enough, would be raised to satisfy the contract with the bridge company. As the volume of business fluctuated—a matter that it was utterly impossible to foretell—there would be either

a deficit or a surplus of income. In the contract the deficit was provided against. But not so as to the surplus. It appears that the tolls first adopted did not meet the anticipations of the responsible parties, nor probably the requirements of the contract, for we find that in 1878 but comparatively little had been accumulated in the way of a sinking fund. So in that year a somewhat elaborate and formal sinking fund scheme was devised and adopted. Further than to retain its general purpose, and the service of its trustees, it was not continued longer, however, than 1881, when a re-arrangement was had. It was then agreed between the railroads and the bridge company that all the income of the bridge company was to be pooled (such as rents, interest on daily balances of deposits, etc.). The railroads were then to pay in each month, without reference to tolls charged or chargeable against them, except as a basis of prorating it among themselves, the annual sum of $36,500. It was thought, and it proved to be true, that this arrangement would safely provide for paying the interest as it became due, and for retiring the mortgage bonds at their maturity. Under the sinking fund scheme finally resorted to by the railroads, and above outlined, it soon developed that the bridge company's income from tolls was frequently greatly in excess of the requirements of the contract. To whom did this excess or surplus belong? Under the contract the bridge company had stipulated that its tolls should not exceed a rate to produce a sum sufficient to pay the enumerated charges. But the rate fixed produced a sum that did exceed those requirements. First and last that question has troubled the railroads contributing to the surplus a good deal, and has been the subject of more than one controversy. The bridge company treated it as belonging to the railroad companies contributing to it in the pro-

portion contributed by them respectively. It therefore rebated it to the railroads accordingly; that is, without collecting it, it was credited back in the proportions in which it had been originally charged. In no instance, so far as the record shows, was a dollar of it collected in fact, and then the money paid back. It was merely a matter of bookkeeping. Annually at the regular stockholders' meetings elaborate statements were submitted by the bridge company's fiscal officers, showing generally, in detail, among the other items, that this system of "rebates" or "redistributions of surplus" was being indulged as shown. No protest or complaint was made by the stockholders, or any of them. From this we find that the stockholders of the bridge company likewise approved and ratified the scheme, and that its execution was a practical interpretation and fulfillment of those requirements of the contract.

Subsequently a controversy arose between the bridge company, the Pan Handle Company, and the Monon Company over the surplus remaining after the discharge of the bonded indebtedness. This came up in an effort to settle an account of the bridge company against the Monon Company for tolls, in which numerous matters were in dispute. A suit was instituted by the bridge company against the Monon Company in the Jefferson circuit court. Availing themselves of the contract, the parties submitted its final decision to the Honorable H. W. Blodgett, of Chicago. He adjudged that the surplus arising from excessive rates of bridge tolls belonged exclusively to the railroad companies contributing thereto in the proportion of their traffic, respectively, passing over the bridge, and creating the surplus. Later the Louisville & Nashville Railroad Company, conceiving that the continuance of this excessive rate was an unnecessary burden, and a source of annoyance and trouble to the roads

Vol. 115].       JANUARY TERM, 1903.            205

Pittsburg, C. C. & St. L. Ry. Co. and Others v. Dodd & Others.

contributing to it, as well as to the commerce bearing it, brought a suit in Jefferson circuit court against the bridge company and the other railroads to compel a reduction of the rates to a point where they would yield no more than enough to meet the requirements of the contract of June 5, 1872, as modified by the parties, and above set out. The Honorable W. O. Harris, as special judge, granted the relief prayed for. In another suit in the Jefferson circuit court, law and equity division, the Louisville & Nashville Railroad Company sued the bridge company and the other railroads to recover its share of the excessive tolls collected by the bridge company over and above the actual requirements of the bridge company under the contract of June 5, 1872, as modified as stated, and that court granted the relief, and adjudged a recovery against the bridge company, which, upon appeal, was affirmed by this court. Louisville Bridge Company v. L. & N. R. R. Co., 107 Ky., 674, 21 R., 271, 51 S. W., 185. Thus it will be seen that all who have had occasion to handle this subject have come to the same conclusion.

If the $107,799.96 was in the sinking fund all this time, its accretions in the way of interest or otherwise, under the pooling arrangement of 1881, acquiesced in and continued all this while, was properly used in discharging the bonds and interest. Whatever may have been the technical rights of the parties on this subject under the original contract, they seem to have treated the matter in this manner as one satisfactory to themselves. Perhaps a reason was that, as the railroad companies were paying 8 per cent. annually net to stockholders on the total capital of $1,500,000, it was thought to be but right that they should have the use of the earning capacity of that total capital.

This brings us to consider whether this $107,799.96 is yet

on hand. That it is not in cash is conceded. When the mortgage debt was paid off in 1888 by the sinking fund trustees, they did not use the $107,799.96 of capital alluded to above. From the proof in the record we find that the actual physical condition of the bridge has been maintained, and that it is in as good state of repair and preservation, so far as is known, as is possible. On this item alone the railroad companies have provided, and the bridge company has expended, during the existence of the contract, $371,-649.66, up to the closing of the proof in this case. From the fact of this condition, and of the proven earning-capacity of this property, we think it fair to assume that it is worth in money at least what it is shown to have cost, nothing appearing in the evidence to the contrary.

In the record are annual statements, made up from the bridge company's books. It is in evidence that the assets of the company shown in these statements, excepting the items of accounts against the Monon and Air Line Com panies for tolls, are absolutely good, and convertible into cash at at least the figures used. By deducting from these assets all the liabilities of the bridge company that it will be compelled to pay, it is shown that there would be left, on a liquidation of the company as of the date of the last statement in evidence (issued a short while before the judgment in this case), a sum that would pay to all stockholders about $1.56 to the dollar of the company's capital. The assets so treated as good are the bridge structure (including fender piers) at the original cost of $2,134,261.50; the new draw span, $36,540.67; real estate, $68,011.50; securities (Pennsylvania Company 4½ guaranteed bonds), $62,-412.75; cash and cash accounts, $117,310.20.

The item on the liability side of the statement "surplus of sinking fund divisible among the railroads contributing

thereto" of $12,929.45 is eliminated from consideration, because if there was not a surplus, then there could not be a liability on that account. We are of opinion from the state of the record that the bridge company does not owe any part of this item to anyone.

It is true that there is owing a greater sum for taxes than is shown on this statement. At that time, however, the matter was in litigation. The railroad companies admit their liability for the difference, and say they are preparing to pay it, and the circuit court reserved control of the case to enforce their payment, if necessary. Therefore, if the $800,000 of bonds paid off for the bridge company be treated as capitalized, it is clear that no part of the capital, either of the $1,500,000 or of the $800,000, has been withdrawn by either of the railroad companies, or anybody else, for the very sufficient reason that it appears to be yet there in the property, in the bridge company's custody and control.

The last item on the "statement," viz., "Balance to credit of income account, $799,649.95," is vigorously attacked as being false in fact and in toto. To our mind it is but a bookkeeper's fancy. It is an arbitrary entry to produce a balance between the two sides of the general statement. It might as appropriately have been entered in one of several other ways. But the name given to it is not material.

There were two other pieces of real estate sold by the bridge company, one sold in 1874 for $5,745.77, and the other for $730, sold in 1885. It is not shown that either of these pieces of property ever represented a part of the capital stock of the company, nor is it clearly shown what became of the proceeds. There was also a balance of undivided earnings claimed to be on hand in 1872, when the railroad companies took charge of the bridge. We assume the theory

to be sustained that all these proceeds were used in defraying operating expenses. If they were, those roads that received the benefit of the improper diversion of these funds would be liable therefor. But the plea of limitation has been interposed against this recovery, and must be applied, as was done by the circuit court.

### The Draw Span and Fender Piers.

Included among the assets of the bridge company, representing an expenditure to that extent of its capital, is the cost of the two fender piers and a draw span built since the contract of June 5, 1872, and within the last few years. The fender piers cost $20,000, and the draw span $36,540.67. It is the contention of appellees that by the terms of the contract of June 5, 1872, the contracting railroads were to build such improvements, or, what is the same, furnish enough additional tolls to enable the bridge company to make them without using its other assets. Of course, if the duty was upon appellants to provide for such improvements at their own expense, it must be because of the terms of the contract alone. The draw span and fender piers are entirely new, and have been made necessary because of conditions not existing, and evidently not contemplated by the parties, when the contract of June 5, 1872, was entered into. In recent years the canal at Louisville has been completed and materially altered, so that, during most of the year, nearly all of the boating traffic on the Ohio river at that point passes through the canal, instead of using the river channel, as was formerly more generally done. The bridge crosses the canal. The great increase of boating traffic at that point, and the widening of the canal, made it a source of constant danger to the bridge structure, because of the liability of passing boats coming in contact

with the bridge work. To avert that danger, the fender
piers were found to be necessary, and were accordingly pro-
vided. The new draw span is what is called a "through
span." The old span was a "deck span," on which the truss-
work was below the plane of the track. This necessitated
quite frequent openings of the draw to allow boats to pass,
which, with the span changed so that below the track it
was free from obstruction, was obviated in a very consid-
erable number of instances. Furthermore, complaint had
been made to the Secretary of War concerning the old span,
it being claimed that it was an obstruction of navigation.
The War Department had required some such change. It
was deemed expedient by the bridge directors, therefore, to
substitute the more modern span, which was done. The
old span was not out of repair, or apparently worse than
when originally built. Changed conditions required, or at
least made wise, the substitution of the new one.

Both of these improvements were substantial and per-
manent betterments of the bridge company's property, which
must be left in good condition when the contract ends. They
are not repairs, and are not charges, by the terms of the
contract, to be provided for by the railroads. It was prop-
er that their cost should have been paid by the bridge com-
pany out of its unexpended capital.

### The 10½ Acres Conveyed to J. M. & I. R. R. Co.

In the contract of 1872 reference is made to the fact that
the Jeffersonville, Madison & Indianapolis Railroad Com-
pany then owned, and was by that contract conceded to
own, the "northern approach" to the bridge. Exactly what
is meant by that expression is uncertain. The Jefferson-
ville, Madison & Indianapolis Railroad Company owned an

extension from its southern terminus near Ninth and Broad-way streets, Jeffersonville, Ind., connecting with the bridge track; also a spur running north to New Albany. It may be that this is the approach referred to. It is argued for appellant Pittsburg, Cincinnati, Chicago & St. Louis Rail-road Company that the term was meant to describe the track over the 10½ acres in question, and extending about 1,700 feet northeast from the northern abutment of the bridge. This contention is not without force. That which inclines us, though, to the other one is the fact that the Jefferson-ville, Madison & Indianapolis Railroad Company did not at that time own that part of the northern approach to the bridge located over this 10½ acres, nor had it ever owned or contracted for it, so far as the record shows. It is claimed that the Jeffersonville, Madison & Indianapolis Railroad Company actually made the fill and built the track on this plat of land. Conceding that to be true, it would not confer ownership of the land, or of the track, upon the railroad company. It would, at the furthest, have created only a liability from the bridge company to the railroad company for the work and material furnished. Whether they have been paid for is not clear from the evidence. But, whether the railroad company had or had not furnished the work and labor claimed, the account therefor was barred by limitation, for aught that the record shows, in 1885, when the bridge company attempted to convey to the Jeffersonville, Madison & Indianapolis Railroad Company the 10½ acres of land, including the track thereon.

The railroad company pleads and relies on the statute of limitation to defeat the recovery for the bridge company. It is charged in the petition seeking to have this convey-

ance set aside that it was ultra vires, and was in fraud of the rights of the stockholders.

We do not think it necessary to elaborate the idea that if, in fact, this approach belonged to the bridge company, its attempted conveyance by the directors, even by the stockholders' concurrence, for that matter, would have been ultra vires. The approach of a bridge is as essentially a part of the bridge as any span or other part. To dispose of the approach is to dismember the bridge, and render it impossible for the bridge company to serve the public as required by its charter. Thompson, Corp., section 5373; Thomas v. R. R. Co., 101 U. S., 83, 25 L. Ed., 950; Whitcher v. Somerville, 138 Mass., 455.

Section 2519, Kentucky Statutes, is invoked by the railroad company. It is:

"In actions for relief from fraud or mistake, the cause of action shall not be deemed to have accrued until the discovery of the fraud or mistake; but no such action shall be brought ten years after the time of making the contract or the perpetration of the fraud."

We are of opinion that that section of the statute can not be applied to this part of appellees' suit. Although, strictly speaking, the Jeffersonville, Madison & Indianapolis Railroad Company may not have been a tenant of the bridge company, its relation was so closely akin to that of tenant to landlord that the principles applicable to that relation ought to be applied. The principles governing the rights of a tenant under such state of case are fairly stated thus in Trabue v. Ramage, 80 Ky., 325, 4 R., 7: "We understand the law to be that a tenant can, under no circumstances, after the lease and entry under his landlord, attorn to another without his consent, or deny the title or claim under which he entered, whether the title or claim be good

or indifferent." To this proposition appellant Pittsburg, Cincinnati, Chicago & St. Louis Railroad Company responds that it has always been lawful for a tenant to acquire his landlord's title. True; but he must get it from the landlord. The directors of the bridge company, who acted for it in this transaction, were also officers of the Pittsburg, Cincinnati, Chicago & St. Louis Railroad Company, and, by reason thereof, also represented the Jeffersonville, Madison & Indianapolis Railroad Company. It was not competent for these officials to transfer to the latter company the bridge company's property in violation of its charter rights and duties, and, too, without adequate consideration . That is one of the acts of the directors that does not bind the corporation. Therefore the Jeffersonville, Madison & Indianapolis Railroad Company, taking the deed with full knowledge in law of the incapacity both of the corporation to execute it and of the directors to represent the corporation in that transaction, acquired no title by the deed. In other words, it was not the act and deed of the corporation. As between the putative grantor and the grantee, it was void. Nor can the lapse of time aid it, because the statutes of limitation can never protect one in a right to property when his claim under the statute is not connected with a possession consistent with the claims. Sewell v. Nelson (23 R., 2438), 67 S. W., 985. Appellant's deed was incompatible with its possession. It was hostile to the title by which and under which it had been let into the possession. It was inconsistent with the implied and continuous undertaking of the contracting railroads to hold and use the bridge as the property of the bridge company. Appellant's possession was not under the deed. It follows, then, that, as the deed was void and the possession not adverse, neither has conferred or can confer upon the Jeffersonville, Madi-

son & Indianapolis Railroad Company or its successor any title whatever against the bridge company. The circuit court correctly decided that the statute was not a bar to appellees' claim to have the lot conveyed to the bridge company so as to clear the record of the spurious deed. This relief, though, should have been only upon condition that the bridge company repaid to the Jeffersonville, Madison & Indianapolis Railroad company or its successor the consideration of $10,286.91 paid by the railroad company for the conveyance.

The Reduced and Omitted Dividends for Years July, 1896, to July, 1899.

Having found that the contract of June 5, 1872, has been modified by the parties so that 4 per cent. semi-annual dividends are provided for in lieu of the 6 per cent. named in the contract, we come to determine whether the contracting railroads are to pay that rate at all events. It is the contention of the railroads that they did not contract to pay any fixed dividend or any sum; but that they agreed, each for itself, to pay the tolls charged against them for their use of the bridge, at a rate or rates to be fixed by the bridge company, but that such tolls "shall not be in excess of a toll or charge sufficient to produce in the aggregate a sum equal to the cost and expense of keeping in repair and taking care of said bridge and its approach, paying a dividend semi-annually of 6 (4) per cent. on said capital stock of $1,500,000," the interest upon the bonds, provide a sinking fund to discharge its mortgage debt, the expense to maintain the bridge company's corporate existence, and to pay the taxes assessed against it.

Whatever may have been the correct construction of this undertaking, the parties have from the first given to it the

construction that the railroads were to pay these charges, viz., the taxes, the cost of maintaining the organization, the repairs and operating expenses, the interest upon and the principal of the mortgage debt, and at first 6 per cent., and latterly 4 per cent., semi-annual dividends upon the capital of $1,500,000. All of these undertakings seem to be of the same rank.

As contracts are a meeting of the minds, or the agreement of the understandings, of those engaging in them, it is generally held to be not so material what words were used, as what was meant and understood by the parties. In disputes over the construction of written contracts, the words employed are first considered. But where the terms are not entirely clear, and the parties have themselves, through a long term of years, by a consistent course of dealing under the contract, with full knowledge of all the facts affecting their rights, construed its meaning and accordingly applied it, the usual labor of the courts is done. We have but to accept and enforce their own construction.

Here the parties have construed that each of the contracting railroads using the bridge was bound to pay to the bridge company, in proportion as the roads' traffic over the bridge bore to the whole volume of traffic by all the contracting roads over the bridge, its proportion of a sum which would discharge the items named. This construction has been from 1872 till this suit was brought. In July, 1896, for the first time under the contract, the bridge company failed to pay its stockholders a semi-annual dividend of at least 4 per cent. It then paid them 2½ per cent. only. For each of the half years following, until 1899, only 3 per cent. was paid. The dividend of July 1, 1899, was passed entirely. These reductions and omissions, on the basis of 4 per cent., amounted to $142,500.

Pittsburg, C. C. & St. L. Ry. Co. and Others v. Dodd & Others.

The Louisville, New Albany & Chicago Railway Company, for some time prior to 1896, had been falling behind in the payment of its tolls under the contract. In 1896 it failed, owing a balance of $128,009.15. The Air Line Company about the same time also fell behind in the payment of its tolls, and failed, owing a balance of $11,331.86. But the whole of these two sums, amounting to $139,341.11 against the railroad companies named, was not actually going to the bridge company as tolls. Part of it represents a charge over and above the necessary requirements of the bridge company as fixed by the 1872 contract, and represents the tolls charged to the Louisville & Nashville Railroad Company, over and above those requirements, to the extent of about $34,-000. This item arises out of the facts stated in that part of this opinion dealing with the judgment of the L. &. N. R. R. Co. v. The Bridge Company.

We are of the opinion that the contracting roads undertook, and that all parties then understood it so, that the tonnage of freight would produce, in the aggregate, a sum sufficient to pay all the fixed charges named in the contract, dividends included. Each for itself agreed to pay its own share, but all undertook, in the proportion that their traffic respectively bore to the total traffic of the bridge, to pay the whole of the sum needed to be raised for the bridge company under the contract. The railroad companies must have so understood it, for they have, in every instance till 1896, acted upon that theory, and lived up to it. The failure of the Monon and of the Air Line to pay their proportions began long before 1896, yet the other roads, parties to the contract, continued to pay enough of tolls, without question or complaint, to provide for the payment of the regular semi-annual payments of 4 per cent. dividends. When the Monon finally became insolvent, for the first time

appellants contended that their subsequent tolls should be decreased; not because of the failure of the bridge company to collect current accounts, but because an old account, incurred some four years prior, could not be collected. That was an account, too, which, had it been collected, would, under the system in vogue, have merely "rebated" to the responsible contracting roads.

We are of opinion that, for their failure to provide an income from tolls sufficient to pay the full dividend of 4 per cent. semi-annually for the years in litigation, appellants are liable, and that the circuit court has properly fixed and apportioned the liability between them.

### L. & N. R. R. Co. v. Bridge Co. Judgment.

Instead of reporting its tonnage of freight direct to the bridge company, the Louisville & Nashville Railroad Company delivered its freight destined for the North by way of Louisville to, and received its northern freight crossing this bridge from, the northern roads using the bridge. These roads made up their accounts and reports of freight so as to include the Louisville & Nashville Railroad Company's. The latter settled and paid upon the basis of the reports made out by these roads, and they in turn paid the tolls to the bridge company. By the system of rebating above alluded to, this matter resulted in the rebates being made to the Northern roads alone. As these rebates were not in fact money paid out by the bridge company, but were credits entered on the current accounts against the respective railroads receiving them, the result was that, to the extent of these rebates, the Louisville & Nashville Railroad Company was being required to pay a higher rate of tolls to the bridge company under the contract than other contracting roads were paying. The Louisville & Nashville Railroad Com-

pany sued the bridge company and the railroads north of the river to recover the excess of freight so collected from it.  A judgment was rendered in its favor against the bridge company for about $168,000.  On appeal to this court that judgment was affirmed.  (107 Ky., 674, 21 R., 271, 51 S. W., 185.)  In the opinion in that case it was said: "It was the plain duty of the defendant bridge company to have restricted its charges to such rates as would have produced a sum of money sufficient to pay its legitimate charges under the contract, and, as it has violated this contract and collected from plaintiff tolls in excess of the amount authorized by the contract, it is liable therefor with interest from the date of such illegal exactions, at least from the time it had accurate and distinct information of the amount due plaintiff from this excess." That action was in court for some time before the final judgment.  On appealing, the judgment was superseded.  The affirmance carried 10 per cent. damages to the appellee Louisville & Nashville Railroad Company against the bridge company.  In the meantime, a considerable sum of interest had accumulated.  The bridge company then proceeded to collect from the railroad companies north of the river, to which the Louisville & Nashville Railroad Company's part of the "surplus" had been credited, the amount so wrongfully given over to them. These were not paid back at once, but in installments, and without interest.  Appellant Pittsburg, Cincinnati, Chicago & St. Louis Railroad Company has paid back all that it received of money that should have gone to the Louisville & Nashville Railroad Company.  Other roads have also paid back their part of the original sum, but none of them paid any interest, or cost, or any part of the damages.  The bridge company has paid off the judgment, including damages, interest and costs.  We are of opinion that, in so far

218 KENTUCKY REPORTS. [Vol. 115

Pittsburg, C. C. & St. L. Ry. Co. and Others v. Dodd & Others.

as the roads north of the river procured and participated in this wrongful distribution of the fund charged by the bridge company against the Louisville & Nashville Railroad Company, and collected in the arrangement detailed, they should reimburse the bridge company, not only the principal of the judgment incurred by it on this account, but the interests, costs, and damages as well. We find that the bridge company defended the suit in the interest and at the request of the northern roads. The railroad companies receiving the credits in the wrongful distribution of the Louisville & Nashville Railroad Company's accounts should bear the burden imposed by the judgment in the proportion only in which they received the improper credits, and each one for itself. So much of this item as may be chargeable against the Monon and Air Line Companies must be collected from them, or be a loss to the bridge company. The Louisville & Nashville Railroad Company can not, of course, be required to bear any part of this item or of this loss.

Assuming that the Air Line and Monon accounts are insolvent (as they appear in fact to be), so far as they embrace parts of the liability for the Louisville & Nashville Railroad Company judgment paid off by the bridge company (estimated at from $34,000 to about $37,158.89, plus their proportion of interest, costs and damages upon that judgment), these liabilities, when ascertained, are to be treated as if they had been collected by the bridge company and then lost. In other words, this sum has been once collected by the bridge company from appellants and other roads as tolls on traffic. Instead of applying it to paying dividends, it was used to pay a judgment against the bridge company for which the Air Line and the Monon Companies were to that extent alone liable as among the railroads. Therefore, when ascertained, the amount of unsatisfied liabil-

ities of the Air Line and Monon Companies, on account of their part of the Louisville & Nashville Railroad Company judgment, will be deducted from the sum herein directed to be paid in by appellants to enable the bridge company to pay the deficits in dividends for the years in litigation.

In providing for the $142,500 of deficit in dividends, regard should be had also to the sums that may be collected from the roads north of the river under this item for reimbursing the bridge company for its payment of the Louisville & Nashville judgment. For whatever sum is collected will represent that much of tolls collected from the traffic by the bridge company, and which was available for dividends, but had been wrongfully diverted. So that, when collected again, it should be applied to its original purpose.

### The Termination of the 1872 Contract.

The circuit court adjudged that the contract of 1872, as modified and heretofore explained, was still in full force and effect, and binding upon both appellants. The last clause of the contract provides for its termination as to all parties embraced in a two years' notice given by one of the parties to terminate it. On the 25th of September, 1897, the Pittsburg, Cincinnati, Chicago & St. Louis Railway Company and the Jeffersonville, Madison & Indianapolis Railroad Company gave notice to the bridge company of the former's intention to terminate the contract on September 25, 1899. On the latter date the parties acted upon that notice, but the railroad company has since continued to send its freight to and from Louisville over that bridge upon the terms fixed by the bridge company as to all other freight. We are of opinion that by the notice and action under it the contract was terminated on September 25, 1899, as to the parties included in the notice.

Wherefore, the judgment upon the cross-appeal is affirmed. Upon the original appeal the judgment is reversed, and the cause is remanded for proceedings and the entering of a judgment consistent with this opinion.

The whole court sitting.

### (June 10, 1903.)

Extension of opinion in response to petition for modification by plaintiffs:

PER CURIAM. What was meant by the expression in the opinion regarding taxes is, appellants will be required to pay the taxes alluded to in the litigation. But, in so far as they have paid them, they will not be required to again pay that amount. Appellants will be credited by the amounts they have paid to the bridge company on the taxes in litigation; in other words, they will have to pay to the bridge company the balance of the sum necessary for appellants to have paid to enable the bridge company to pay its taxes in question. The court adheres to the opinion that the contract of 1872 was terminated by the notice of 1897, and came to an end in 1899 as to all parties to that notice. But we do not, of course, undertake to pass upon the rights and liabilities of the parties since the termination of the old contract. And in all other respects the petition for an extension and modification of the opinion is overruled.

The whole court sitting.