# MADISON TRUST CO. v. STAHLMAN.

## (*Nashville.*   December Term, 1915.)

1. **EQUITY.   Submission of special interrogatories to jury.**

   In an action on a note executed and given in return for corporate stock, wherein the defendant sought cancellation on the ground that it was secured bv fraud, *held* not error to submit certain interrogatories to the jury.  (*Post, pp.* 411-413.)

2. **APPEAL AND ERROR.   Review.   Matters not necessary to decision.**

   Where the facts founds by the jury are sufficient to support the judgment rendered, the court on appeal need not consider whether the successful party would be entitled to new trial on another finding of fact made adversely to him.  (*Post, p.* 413.)

3. **CORPORATIONS.   Subscriptions to stock.   False representations.   Evidence.**

   Evidence held to show such material false representations as to the value of corporate stock for which a note was given and renewals were taken as to preclude recovery against the maker. (*Post, pp.* 413-417.)

4. **CORPORATIONS.   Authority of officers.   Interest adverse to principal.**

   Although officers of a corporation are systematically looting it, they are not so adverse in interest as to relieve the company of responsibility for fraudulent representations made by such officers inducing a sale of stock of the corporations to de-defendant, so as to invalidate defendant's note given for the price thereof.  (*Post, pp.* 417-420.)

5. **BILLS AND NOTES.   "Bona fide purchaser."   Renewals. Defenses.**

   Notice affecting the holder of a note must exist at the time he acquires the instrument, and notice of a defense brought home to him at the time he takes a renewal note does not debar him from claiming as a *bona fide* purchaser;  but this rule is

Madison Trust Co. v. Stahlman.

not applicable to a note procured by the fraud of a corporation, and thereafter transferred to another corporation under the same management and control, which latter corporation took a renewal note. (*Post, pp.* 420-422.)

Case cited and approved: Coyne v. Anderson's Ex'rs. (Ky.), 73 S. W. 753.

6. **BILLS AND NOTES. Consideration. Fraud. Representations.**
Where mere future promises are insufficient to support a charge of fraud, statements of an agent of a corporation that its stock was worth more than it had been when purchased by defendant, and that defendant could get a good price for it, as a result of which defendant removed his note given for the price, were not mere future promises. (*Post, pp.* 422, 423.)

Cases cited and approved: Maney v. Porter, 22 Tenn., 347; Chamberlain v. Coke Co., 92 Tenn., 13.

7. **BILLS AND NOTES. Defense to note for price.**
The C. Trust Company sold its stock to defendant and took his note for the price, and thereafter obtained a controlling interest in the M. Trust Company and transferred such note to it. The M. Trust Company by fraudulent representations as to the value of the stock induced defendant to give a renewal note. *Held*, in an action by the M. Trust Company to recover on a note in which defendant interposed a defense of fraud not only as to the C. Trust Company, but as to the M. Trust Company, the latter corporation could not contend that, inasmuch as the stock purchased had become a trust fund in favor of the creditors of the C. Trust Company, which had become insolvent, defendant was not permitted to interpose such defense, since the rights of the creditors of the C. Trust Company were not involved, and since plaintiff corporation, in view of Banking Act N. Y. (Consol. Laws, ch. 2) sec. 186, subsec. 1, authorizing banking corporations to act as agent, was chargeable with the fraud committed by the M. Trust Company. (*Post, pp.* 423-428.)

Cases cited and approved: Pittsburg, etc., Ry. Co. v. Dodd et al., 115 Ky., 176; Farmers' Loan & Trust Co. v. N. Y. & Nor. Ry. Co., 150 N. Y., 410.

Madison Trust Co. v. Stahlman.

Cases cited and distinguished:   Towles & Co. v. Miles, 131 Tenn.,
    79;  Bank v. Campbell, 23 Tenn., 394.

FROM DAVIDSON.

Appeal from the Chancery Court of Davidson Coun-
ty.—JAS. B. NEWMAN, Chancellor.

KEEBLE & SEAY, for appellant.

EDWIN A PRICE, for appellee.

MR. JUSTICE FANCHER delivered the opinion of the
Court.

The original bill is to recover $14,000, and interest,
on a promissory note executed by E. B. Stahlman on
December 12, 1910.  The complainant alleged that it
was a holder in due course.  The original note was first
given payable to the Carnegie Trust Company in pay-
ment of stock in that corporation.  It was transferred
by the Carnegie Trust Company to the Van Norden
Trust Company, which later by change of name became
the Madison Trust Company.  Several renewals were
had, each one being delivered to the Carnegie Trust
Company, and later delivered by it to the Madison
Trust Company.

The defendant resisted payment on grounds set out
in the answer and cross-bill filed by him, alleging that
he was induced and persuaded by means of false and

fraudulent representations to purchase one hundred shares of the capital stock of the Carnegie Trust Company, a banking concern incorporated under the laws of New York, and doing business in that State; that from time to time defendant made payments on the principal and interest, reducing it to $14,000 in December, 1910; that renewal notes were executed as those maturing fell due, during which time the false and fraudulent representations were continued, and defendant urged not to sell or dispose of his stock. It was alleged that at the time of the execution of the original and all other notes the finances of the Carnegie Trust Company were so managed by those in control of the handling of its funds and assets, the loaning of large sums of money to clerks and other irresponsible parties, secured by worthless collateral, known to be such by those procuring the transaction, that the officers of the Carnegie Trust Company knew that it would only be a short time until it would fail. Many other matters were averred, setting out the fraudulent conduct of these officials.

It was denied that complainant took the note sued on for value or in due course of trade, or in good faith, or for a valuable consideration before maturity. Defendant averred that complainant took the note with full knowledge of this fraudulent conduct; that complainant by lending itself to said Carnegie Trust Company, as an instrument for the fraudulent and inequitable oppression of defendant, has been guilty of such wrong as entitles defendant to relief against it, partic-

ularly so since the Carnegie Trust Company is insolvent.

The cross-bill seeks to have the note sued on delivered up and canceled.

The original note was dated January 8, 1909. The stock was sold to defendant at $165 per share, making $16,500, which he agreed to pay and for which he executed his note. This original note was payable to the order of the Carnegie Trust Company one year after date. The original note was first transferred by indorsement of the Carnegie Trust Company on or about May 20, 1909, to the Van Norden Trust Company. On May 27, 1909, a guaranty of payment of this note was executed by C. C. Dickinson and W. J. Cummins, president and managing director, respectively, of the Carnegie Trust Company. This guarantee was released by the Van Norden Trust Company on June 3, 1909.

Previous to the purchase of this note, and about April 28, 1909, the said Dickinson, on behalf of himself and other controlling interests in the Carnegie Trust Company, purchased a majority of the stock in the Van Norden Trust Company from a number of officials of that company who had pooled their stock for purposes of sale.

This original note, transferred to the Van Norden Trust Company, was renewed from time to time by the defendant, as stated, and it is upon one of these renewal notes that the present suit is brought. In the meantime defendant had paid a portion of the original indebtedness. These payments and renewals were in

each instance made to W. J. Cummins, or to the Carnegie Trust Company, through W. J. Cummins, who was one of the controlling men in that institution, along with Dickinson and others. For a time the directorate of the Van Norden Trust Company remained as it was before the purchase of this controlling interest, but at a later period a number of old directors resigned and their places were filled by men selected by those controlling the Carnegie Trust Company. At the time this original note was transferred to the Van Norden Trust Company the directorate of that concern was the same that it had been before the controlling interest was acquired by the Carnegie Trust Company. From July, 1909, to December 28th of that year various changes were made in the directorate and officials, giving Dickinson, Cummins, and others control of the management. This group of persons owned a majority of the stock of both institutions.

The Carnegie Trust Company failed on January 7, 1911, and since that time has been in course of administration as an insolvent concern under the banking laws of New York.

On the trial of this case the following issues were submitted by the complainant to the jury. The answers of the jury to these issues follow immediately:

"I. Did the Van Norden Trust Company of New York, N. Y., on May 20, 1909, acquire a note of the defendant, E. B. Stahlman, executed January 8, 1909, for $16,500, payable to the order of Carnegie Trust Com-

pany twelve months after date, with interest at 5 per cent?

"Answer: Yes.

"II. If you answer issue No. I 'Yes,' then did the Van Norden Trust Company pay a valuable consideration for the said note, and, if so, was the amount paid for said note the face of the note, less the discount?

"Answer: Yes.

"III. Is the note sued on in this cause a note executed by the defendant, E. B. Stahlman, as a renewal of the unpaid balance due on the original note, executed on January 8, 1909, described in issue No. I, submitted by complainant hereinabove?

"Answer: Yes.

"IV. Has the note sued on in this cause, or any part thereof, been paid?

"Answer: No.

"V. Was the name of the corporation known as 'Van Norden Trust Company,' changed subsequent to the date of May 20, 1909, to that of 'Madison Trust Company,' and was the Madison Trust Company, at the time this suit was brought, the owner of the note sued on herein?

"Answer: Yes."

The following issues were submitted by the defendant, and the answers of the jury thereto appear.

"I. Did E. B. Stahlman, the defendant, by reason of the false and fraudulent representations made to him by the Carnegie Trust Company, acting through its agents, officers or representatives, purchase one hun-

dred shares of the capital stock of the Carnegie Trust Company, and execute therefor his note dated January 8, 1909?

"Answer: Yes.

"II. Did the Carnegie Trust Company, acting through its officers, agents, or representatives, after the execution of the original note, dated January 8, 1909, by false and fraudulent representations made to defendant, induce and persuade him not to sell or dispose of said stock and to execute renewals of said original note, or new or substitute notes therefor, including the one sued on in this cause?

"Answer: Yes.

"III. Did the Carnegie Trust Company, its officers and representatives, own the capital stock and control the business of the Carnegie Safe Deposit Company?

"Answer: Yes.

"IV. Did the defendant know, or have cause to know, until after the failure of the Carnegie Trust Company, that said original note, or renewals or substitutes for same, were not held by the Carnegie Trust Company?

"Answer: No.

"V. Did Carnegie Trust Company, or those in control of same, acquire a majority of the stock or controlling interest in complainant Madison (Van Norden) Trust Company in March or April, 1909?

"Answer: Yes.

"VI. Did the complainant have actual knowledge of the consideration of said original note, and the circum-

stances attending the execution and delivery of same by the defendant, or knowledge of such facts connected with and bearing on the consideration and execution and delivery of said original note by defendant that its action in taking said instrument amounted to bad faith?

"Answer: No.

"VII. Did complainants have actual knowledge of the consideration of said original note, and the circumstances attending its execution and delivery, at the time of the renewal of the same, or at the purchase or taking of any new or substitute note therefor, or knowledge of such facts connected with or bearing on the consideration, execution, and delivery of said original note at the renewal of same, or at the purchase or taking of any new or substitute note therefor, that its action amounted to bad faith?

"Answer: Yes.

"VIII. Was the Carnegie Trust Company representing or acting as agent of complainant, Madison Trust Company, in making the several renewals with defendant of his original note or purchase of the new or substitute note or notes therefor?

"Answer: Yes.

"IX. Were the several notes which were given by defendant to Carnegie Trust Company after his first note, which matured January 10, 1909, including the one sued on, new notes?

"Answer: Renewals.

"X. . Did the Carnegie Trust Company, by means of the Carnegie Safe Deposit Company, hold the Carnegie Trust Company stock as security or collateral for defendant's note of January 9, 1909, which had been given for the purchase of said stock?

"Answer: Yes."

Complainant objected to the action of the chancellor in submitting defendant's issues 2, 3, 4, 5, 6, 7, 8, 9, and 10, for the reasons that such issues were immaterial and submitted questions of fact which were not determinative or relative to any material issue in the case. These objections were overruled by the chancellor, and correctly so. They were material. It is quite common now to submit a number of interrogatories to the jury on clear-cut questions of fact.

At the close of all the evidence, and before the charge of the court to the jury, and before the issues were finally submitted to the jury, the complainant moved the court to withdraw the further consideration of the case from the jury and grant complainant a decree for the amount of the note sued on upon various grounds, all going to the question, in substance, that there was no evidence in the record to sustain the defenses to the note set up by the defendant in his answer and cross-bill.

The defendant asked for a new trial on the question and answer thereto by the jury submitted by him as issue No. VI.

The chancellor pronounced a decree in favor of defendant, dismissing the complainant's bill, notwithstanding the response of the jury to defendant's issue No. VI. The chancellor was of opinion that, notwithstanding the finding of the jury on this issue adverse to defendant, the cause could be determined under the issues and facts found by the jury.

The four assignments of error raise the questions considered in this opinion. These assignments, in substance, were:

(1) That the issues of defendant were irrelevant and not controlling or determinative of the cause, and should not have been submitted to the jury.

(2) That the evidence considered in its stronger light in favor of defendant does not sustain the defenses to the note, and the cause should have been withdrawn from the jury on the motion of complainant and a decree entered in its favor; the uncontradicted proof showing that complainant is a *bona fide* holder for value before maturity, in due course of trade, and without notice.

(3) That there was no evidence to sustain the answers of the jury to defendant's issues Nos. 1, 2, 3, 4, 5, 7, 8, and 10, and that the exceptions to these findings and the motion for a judgment on the note upon the answers of the jury to complainant's issues Nos. 1, 2, 3, 4, and 5 and defendant's issues Nos. 6 and 9 should have been sustained.

(4) That upon the pleadings, proof, findings of the jury and the entire record the complainant was entitled to a decree against the defendant for the amount of. the note sued on, with interest and costs.

We deem it unnecessary to determine whether a new trial could be granted as to the single issue, No. 6, upon defendant's assignment of error, or whether it would be necessary in order to get relief in such case to secure a new trial out and out, because we are of opinion that the facts found by the jury were such as will enable the court to determine the case.

It is unnecessary to enumerate the many false and fraudulent representations and inducements by the Carnegie Trust Company, through its agents, upon which defendant relied when he purchased the stock of the corporation for which the original note was executed.

The proof shows that it is a custom and usage among the banking and trust companies in New York to mail to the maker of maturing notes notice of the fact that such bank or trust company holds the maturing obligation.

On December 14, 1909, nearing the maturity of the original note executed by E. B. Stahlman to the Carnegie Trust Company Mr. Stahlman directed a letter to W. J. Cummins, Carnegie Trust Company, New York calling attention that the note would soon fall due, and desiring to know what the stock was worth, and if it could be sold for a reasonable profit or if Cummins advised holding it, and also whether he could arrange for

a renewal of the note. Mr. Cummins replied upon the stationery of the Carnegie Trust Company, showing that W. J. Cummins was director from Tennessee, advising defendant not to dispose of his stock, and expressing confidence that:

"We will carry out our original purpose, which will very greatly increase the value of the stock. However, it is at present quoted as low as we can work it down to—this I say to you in confidence."

He then instructed defendant to send a check for $1,000 and a ninety-day note.

A little later defendant wrote again to W. J. Cummins, Carnegie Trust Company, New York, and received a reply, in which Mr. Cummins sent defendant a note ready for signature, stating that:

"The bank prefers this style of note, holding your stock in escrow."

Other correspondence followed. On January 8, 1910, defendant wrote to George C. Cummins, who had taken up the correspondence for W. J. Cummins, inclosing his note, payable to the order of the Carnegie Trust Company, with his check making a payment on the note. On March 31, 1910, defendant wrote to W. J. Cummins, Carnegie Trust Company, in reference to the new note, that on April 10th it would fall due, and that he could not pay it unless obliged to do so, and asking what could be done about arranging it. He was advised that he could renew the note by making a payment of $1,000, and defendant received along with this letter a notice from the Carnegie Trust Company calling attention to

the time when the note would fall due. Defendant made this payment and executed the renewal note, sending it to W. J. Cummins, and calling attention to the fact that one hundred shares of stock of the Carnegie Trust Company which was placed with the Carnegie Safe Deposit Company would remain as collateral security for the note. A little later defendant wrote again, asking for the return of the original note, and this note was later sent to defendant by Mr. Cummins' secretary. On August 3, 1910, defendant wrote another letter to W. J. Cummins, Carnegie Trust Company, New York, with reference to the renewal note which would fall due on the 10th of that month. In this letter defendant stated that he did not see how he was going to be able to pay anything on the note at that time; that calls were made upon him to meet life insurance premiums, and other obligations had been heavy. He also wanted to know why he had not received his dividend for June, and asked: "What is the trouble?" On August 12th W. J. Cummins wrote to defendant and inclosed a note, asking him to sign on the bottom as he had before, and also to indorse same on the back and to return to him with check payable to the Carnegie Trust Company for $1,000 on the principal, and also the interest. Mr. Cummins stated in this letter that:

"By the time this note is due I believe you can sell this stock for a good price. Things have been happening which I wish I could explain to you, and in the next sixty or ninety days you will see a good strong advance

in Carnegie Trust Company stock. The company is now doing splendidly.''

Mr. Cummins also stated that if he had the money to spare he would buy still more of this stock, and he used the statement:

''Ultra-conservatism—Reichman and others are following. Dividends will be declared semiannually hereafter and paid that way after earnings are made and known.''

On August 17th defendant mailed to W. J. Cummins, Carnegie Trust Company, New York, a note for $14,-500, dated August 11, 1910, ''payable to the order of myself four months after date.'' The old note was thereupon returned by the secretary of W. J. Cummins. Defendant wrote again on December 3, 1910, to W. J. Cummins in regard to the renewal of the indebtedness, and received a letter from Mr. Cummins advising that a payment of $1,000 be made on the principal, and that the interest be paid, and again said:

''Everything is getting better up here weekly, and you will get a good price for this stock this spring. I will keep you thoroughly posted and know I will make a nice profit for you.''

The letter inclosed a notice from the Carnegie Trust Company that this note would fall due on December 12, 1910. A note was sent to defendant on this occasion to be executed, and defendant replied, returning this note and asking that he be sent a note for $14,000, paying only $500 instead of $1,000. In reply to this, on December 8, 1910, Mr. Cummins again wrote defendant

that he had submitted his request to the president, J. T. Howell, and that he gave him the inclosed note to send to defendant for his signature and for. indorsement on the back. This note was executed and returned to W. J. Cummins, Carnegie Trust Company, New York, asking for the return of the old note. This closed the correspondence between defendant and the representatives of the Carnegie Trust Company.

During the time of this correspondence defendant did not hear and did not know that any of these notes were held by the Van Norden Trust Company or the Madison Trust Company, and he had never received any notice from either of these concerns of his maturing obligations. It was represented to defendant when he purchased this Carnegie Trust Company stock that it was treasury stock held by the company. This turned out later to be false.

After the failure of the Carnegie Trust Company it was admitted by W. J. Cummins that this concern had been in a failing condition for some time. The chancellor found under the facts of the case, in an opinion filed by him, that it was insolvent, or rapidly approaching insolvency, and was being effectively looted by those in control at the time these glowing representations were made to defendant of the condition of affairs.

Complainant contends that Mr. Cummins did not represent the Carnegie Trust Company, but that 'the sale of this stock was by Mr. Cummins and Mr. Dickinson. It appears, however, that this stock was bought on the

open market with the money of the Carnegie Trust Company for the company, and it was in reality the property of the Carnegie Trust Company. Mr. Cummins and Mr. Dickinson were high officials of that company. They had no interests antagonistic to the company, as claimed by complainant's counsel, and hence they did not occupy a position where they could not properly act for the company. It is undoubtedly true that during these transactions they were very effectively robbing the company by procuring loans in favor of various speculative concerns in which they were interested, and in a sense they acted antagonistic to the best interests of the company. In the sale of this stock to defendant they were procuring a high price for stock which was at least of doubtful value, and in effecting the sale by these false and fraudulent representations they did so for and on behalf of the Carnegie Trust Company.

When the original note was transferred to the Van Norden Trust Company, to wit, on May 20, 1909, eight of the ten directors present and accepting said note had sold their stock to C. C. Dickinson and others who owned the majority stock and controlled the Carnegie Trust Company. It is insisted that these directors were representatives and servants of Mr. Dickinson and the "Carnegie group." Under the facts of this case we are of opinion that the jury might very well have come to the conclusion that the acceptance of this note originally by the Van Norden Trust Company was not by virtue of the independent judgment of its board

of directors, but that it was influenced and actuated to do so by the overpowering control of the Carnegie Trust Company, which at that time had gained control of the Van Norden Trust Company. However, the verdict of the jury is in favor of complainant on this point, and that verdict was undisturbed by the chancellor. We are of opinion that the jury had some facts upon which to reach this conclusion, although it is not a finding of fact unmixed with law. We do not, however, deem it necessary to disturb the finding of the jury.

A great difficulty in the way of complainant's recovery is the defense, sustained by the jury, that the defendant was induced to execute the renewal notes by fraudulent representations of the agent of the Carnegie Trust Company, who was likewise at that time the agent of the Van Norden or Madison Trust Company. The jury found that the Carnegie Trust Company, through its officers, agents, or representatives after the execution of the original note, dated January 8, 1909, by false and fraudulent representations made to defendant, induced and persuaded him not to sell or dispose of said stock, and caused him to execute renewals of the original note, including the one sued on in this case. The jury found that the Carnegie Trust Company, or those in control of same, acquired the majority stock and controlling interest in the Madison Trust Company, and that it had actual knowledge at the time of renewal of the fraudulent procurement of the original note, or knowledge of such facts connected with or bearing on the consideration, execution, and delivery

of said note that its action amounted to bad faith.   The jury found that the Carnegie Trust Company represented or acted as agent of complainant, the Madison Trust Company, in procuring said renewals.   In other words, the facts found by the jury show that, when the Carnegie Trust. Company, as agent of complainant, procured defendant to execute renewal notes, it did so by false and fraudulent inducement.   If defendant had not thus been influenced, he could, and probably would, have protected himself.   He could have forced the Carnegie Trust Company to rescind or cancel the contract for the stock in question.   His letter written during the pendency of these transactions to this agent shows that his suspicions and fears were aroused.   He called attention to the fact that the dividend had not been paid, and wanted to know what was wrong.   The agent intrusted with this business who procured these renewals from defendant was a former Nashville man, where defendant had resided for many years.  Defendant had known him, and had been led to regard him as a man of ability.   Defendant was encouraged and his hopes built up that he would make good money out of the purchase by false statements made at a time when the Carnegie Trust Company was either insolvent or nearing insolvency.  Defendant was kept in ignorance of the true condition of the Carnegie Trust Company until it was too late for him to obtain redress against it.   It had in the meantime failed, and had gone into insolvency and ruin.

Complainant cites a number of authorities as holding that one who takes good title when he purchases or discounts an original note, by receiving it before maturity, in good faith, for value and without any notice of want of consideration, or any infirmity in the instrument, may recover on the renewals thereof. Complainant says that, if the renewal notes were invalid, the original note remained in full force, and that, if defendant was damaged b ythe taking of the renewal, his only remedy would be a recoupment against the holder for the damage, but that he would have to suffer a recovery on the note.

Renewals are considered merely a continuation of the original contract during the time extended for payment. Daniel on Negotiable Instruments (6th Ed.), vol. 1, p. 303.

Notice affecting the holder must exist at the time he acquires the instrument; for then his relation is fixed, and subsequent notice does not affect his title unless he is so situated that he can protect the maker without injury to himself. Daniel on Neg. Inst., vol. 1, p. 929.

It was held that, where want of consideration was not discovered by the holder until during the negotiation for a renewal of the note, this would not affect his rights as his rights were fixed by the original transaction. *Coyne* v. *Anderson's Ex'rs* (Ky.), 73 S. W. 753.

These authorities do not go to the question, which is that here are two corporations under the same management and control, so that in all matters affecting the two the action of one is the action of the other. The

fraud of the one becomes the fraud of the other. Take it for granted that in the original negotiation notice of the fraud in procuring the first note was not communicated to the transferee, and that it was taken in due course; the transferee remained innocent until the corporate management came under the same ownership, domination, and control as that of the original payee. Thereupon the frauds were continued, and payments and renewals fraudulently obtained. It was then not a renewal with mere knowledge of the former fraud, obtained in negotiation of an extension of credit. The transferee adopted and continued in force the frauds originally employed as its own. How, then, can it escape? We know of no principle that can absolve the holder when it has thus entered upon and appropriated the original fraudulent devices in taking renewal notes. What is meant by the authorities undoubtedly is that innocent knowledge by a holder in due course which he has obtained when he extends further credit will not prevent a recovery. The jury found bad faith was present in the taking of the renewal or substitute notes upon the part of complainant. This is borne out by the proof. There was actual fraud in procuring the various partial payments received by complainant and in arranging renewals at the time such payments were made.

Complainant contends that the statements made by Cummins as to the condition of the Carnegie Trust Company and its prospects were mere expressions of opinion and predictions, which are not statements of

existing facts, and consequently are not fraudulent, and are insufficient for the purpose of rescinding a contract at law or in equity. The legal position is correct if the facts were as assumed by counsel for complainant. Elliott on Contracts, vol. 1, section 84; *Maney* v. *Porter,* 3 Humph., 347; *Chamberlain* v. *Coke Co.,* 92 Tenn., 13, 20 S. W., 345.

The answers of the jury to defendant's issues Nos. 1 and 2 show that false and fraudulent representations were made by the agents of the Carnegie Trust Company, by reason of which defendant purchased the Carnegie stock and executed the original note, and that by false and fraudulent representations made to defendant by the Carnegie Trust Company, through its officers, agents, or representatives, he was induced and persuaded not to sell or dispose of the stock and to execute renewals, including the one sued on. The record is large, and there are many circumstances upon which the jury found these facts. This did not consist of mere expressions of opinion only, but many false statements were made of existing facts, by which defendant was led to believe the stock was very valuable, when, in fact, the company was in the hands of a lot of financial crooks and was being rapidly bankrupted.

It is now insisted by the complainant that because of this failure and insolvency the purchase of the stock has become a fixed obligation beyond any power on defendant's part to cancel the contract for fraud or for any other reason. It is insisted that the stock in the Carnegie Trust Company has now become under the

laws of New York a trust fund for the benefit of credi-
tors, and complainant cites authorities relied upon by
it to show that defendant cannot now question the trans-
action.  It is not necessary for us to determine this
question because the point is not involved.

It appears that there is another suit pending to re-
cover from defendant a double liability, arising under
the New York banking laws in favor of creditors on
account of this stock.  The proposition submitted may
be a live question in that case, but not here.

This is not a suit by the Carnegie Trust Company
or its creditors for the purchase price of this stock,
but it is a suit by the holder of a note executed by de-
fendant growing out of the transaction or purchase,
but now held by the Madison Trust Company.  The
Carnegie Trust Company transferred this note with-
out recourse, so its creditors are not affected because
its funds cannot be reached, so far as we can now see.
But this insistence upon the part of complainant does
suggest and illustrate that defendant is powerless
to get relief against the frauds through any litigation
with the Carnegie Trust Company.  How has this re-
sulted?  Because of the fact that W. J. Cummins, the
agent securing these various renewals for the Madison
Trust Company, by false and fraudulent statements,
induced defendant to continue payments on the obliga-
tion and to execute renewal notes, and kept concealed
from him the fact that he had been defrauded in the
original transaction.

Before the last renewals of these notes and at the time thereof the Carnegie Trust Company had acquired complete control of the stock and directorate of complainant. But the control of the personnel of the directorate is simply one way in which the control of a corporation is obtained. There are instances where this control is reached when the majority of stock of two corporations is held by the same persons, or where one corporation has charge of the controlling interest in another corporation, and especially where the two corporations have dealings with each other or joint plans and schemes of business. When the control of one corporation by another holding a majority of its capital stock is so complete as to set aside the ordinarily recognized power of the board of directors, or to subordinate their judgment, and thus control the dominated corporation, then the dominant corporation for all practical purposes becomes the corporation through which matters of liability are effected to it. *Pittsburg, etc., Ry. Co.* v. *Dodd et al.,* 115 Ky., 176, 72 S. W., 822, 74 S. W., 1096; *Farmers' Loan & Trust Co.* v. *New York & Nor. Ry. Co.,* 150 N. Y., 410, 44 N. E., 1043, 34 L. R. A., 76, 55 Am. St. Rep., 689. Mr. Cook on Corporations, section 662, has this to say:

"The New York court of appeals has well said that, where a 'majority of the stock is owned by a corporation or a combination of individuals, and it assumes the control of another company's business and affairs through its control of the officers and directors of the corporation, it would seem that for all practical pur-

poses it becomes the corporation of which it holds the majority of the stock, and assumes the same trust relation towards the minority stockholders that a corporation itself usually bears to its stockholders.''

There is absolutely no doubt that soon after the merger of the two corporations by the purchase of the controlling interest in the Van Norden Trust Company by those in control of the Carnegie Trust Company the two concerns became so interrelated that knowledge of the one became the knowledge of the other. The fraud, false representations, and lack of full representation of the agent who procured the various renewal notes, including the one sued upon, became at once the fraud of complainant.

In a recent opinion this court, in passing upon a question of independent contractor, where it appeared that a corporation organized to do a part of the work of construction was but the tool and creature of a firm constituting the principal contractor, refused to recognize the corporation as an independent contractor because lacking in that element of independence of action required to constitute an independent contractor. It was said:

''A corporation will be treated as a distinct legal entity ordinarily, and until proof is adduced to the contrary. But that notion will not prevail when the result would be to give countenance and effect to a mere sham and work injustice.'' *Towles & Co.* v. *Miles,* 131 Tenn., 79, 173 S. W., 439.

Mr. Cummins was not only the agent and a high official of the Carnegie Trust Company, but was intrusted with this whole affair.

The knowledge of the Carnegie Trust Company of this fraud affected the Madison Trust Company, because its judgment and knowledge in the matter is that of the dominant corporation.

The right of one corporation to act as the agent of another, unless restricted in its charter, is declared by Mechem on Agency, section 173.

The New York Banking Act by section 186, subsec. 1, specifically grants the power of a bank to act as the fiscal or transferred agent of another State, municipality, body politic, or corporation, and to act as the agent of any corporation, foreign or domestic.

In *Bank* v. *Campbell,* 4 Humph., 394, holding that every director of a bank is its agent, and that notice to the agent is notice to the principal, it is stated:

"But in a transaction in which he acts as one of the board notice to one director is notice to the bank. Nor can it be necessary that the notice shall have been communicated to him in relation to the particular transaction on which he is about to act."

The corporation acts only through its agent. The fraud of the agent is the fraud of the corporation. But it is not alone by virtue of the law of agency that we hold the Madison Trust Company answerable for these frauds, but for the additional and paramount reason that the same dominating power and control which dic-

tated its affairs, and, in fact, brought about these transactions, was the overpowering influence of intercorporate management, which made the act of one the act of the other in the particular business here involved.

The decree of the chancellor is affirmed.