DALE v. THOMAS H. TEMPLE CO. *et al.*

(*Nashville,* December Term, 1947.)

Opinion filed January 16, 1948.

72

ARMISTEAD, WALLER, DAVIS & LANSDEN, of Nashville, for receiver.

NORVELL & MINICK, of Nashville, for Potter Group.

W. M. FUQUA, of Nashville, for Caldwell Group and Caldwell Corporations.

MR. JUSTICE GAILOR delivered the opinion of the Court.

J. C. Dale, Jr., having been appointed receiver of the Apex Oil Corporation by the Chancery Court of Davidson County on March 27, 1940, thereafter, on July 30, 1941, brought this suit to recover certain funds of Apex which he alleged had been wrongfully diverted and misappropriated by the defendants by (1) conspiracy, (2) fraud, and (3) unjust enrichment. The defendants are divided into three groups: (1) Thomas H. Temple Company, Edward Potter, Jr., Justin Potter, Mrs. Bertha Herbert Potter and Thomas H. Temple, referred to as "The Potters" or the "Potter Group." Mrs. Myra J. Blair and Mrs. Lollie Evans were originally made defendants in this group, but by agreement the bill has been dismissed as to them. (2) James E. Caldwell, who has died since the litigation started, Rogers Caldwell, Meredith Caldwell, individually and as administrator *ad litem* of James E. Caldwell, referred to as the "Caldwell Group," or the "Caldwells"; and (3) James E. Caldwell & Company, and James E. Caldwell Sons & Company, referred to as the "Caldwell Corporations."

In the original bill the receiver alleged that the Potter Group sold the Caldwells stock in Apex which represented control of that corporation, that notes were taken by the Potters for the deferred purchase price, that the Caldwells, individually, and through the Corporations which they absolutely dominated and controlled, conspired to use the funds of Apex to pay these notes and the Potters joined the conspiracy and actively participated therein by accepting payments on these notes with notice that the payments which they accepted were made with funds wrongfully diverted by the Caldwells from the funds of Apex. Recovery from the Caldwell Corporations was sought because these Corporations were parties to the conspiracy. James E. Caldwell & Company was the par-

ent corporation and the other Caldwell Corporations which were involved in the sale of the Apex stock, were mere dummies wholly owned and completely dominated in the entire matter by the parent Corporation. In our further statement of the history of the case and the relations of the parties we have borrowed from the careful and comprehensive opinion of the Court of Appeals.

The receiver sought a decree in the total amount of $205,931.10, with interest. This total is made up of the following four items: (1) $73,718.05 being money of Apex which was used by the Caldwells to pay for the stock purchased by them from the Potters. (2) $45,000 which was the amount of a debt due Apex in cash but which as a part of the fraud was canceled with stock of the Red Ace Petroleum Company, issued for that purpose and without a justifying increase in the assets of Red Ace. (3) $21,440 which is made up of two other items: $4,440 which was rent paid by the Caldwells for the use of Apex wharves which had theretofore been wrongfully sold by them, and $17,000 representing a loss in profit to Apex by wrongful sale of said property. (4) $65,773.05 representing the amount of salary drawn by Rogers, James E., and Meredith Caldwell during their control of Apex.

The Chancellor entered a decree (1) against the Caldwells and James E. Caldwell Sons & Company for the $73,718.05 item, (2) against the Caldwells for the $45,000 item, (3) denied a recovery against any defendant on the other two items (4) dismissed the bill as to James E. Caldwell & Company and the Potters, and (5) refused to allow interest.

From the parts of the decree adverse to them, the receiver, the Caldwells and the Potters appealed to the Court of Appeals, and James E. Caldwell Sons & Company brought the case there by writ of error. The

Court of Appeals modified and affirmed the Chancellor's decree and awarded a recovery (1) against Rogers Caldwell, Meredith Caldwell, Meredith Caldwell as administrator *ad litem* of the estate of James E. Caldwell, James E. Caldwell & Company, James E. Caldwell Sons & Company, Thomas H. Temple Company, Edward Potter, Jr., and Justin Potter, Mrs. Bertha Herbert Potter and Thomas H. Temple, for the item of $73,718.05, and for the item of $45,000, making a total judgment against the named defendants of $118,718.05. The Court of Appeals further allowed a recovery against each of the Caldwells for the amount of salary drawn by each from the funds of Apex.

And finally, the Court of Appeals provided that the judgment should bear interest at 3% from the time of the filing of the original bill on July 30, 1941, to the entry of the Chancery decree on December 14, 1945, and should bear interest at 6% from December 14, 1945, until the entry of the decree in the Court of Appeals.

Petitions for *certiorari* on behalf of (1) the receiver, (2) the Caldwells, and (3) the Potters, have been filed in this Court. We granted the writs, have heard argument and the case is before us on elaborate briefs and reply briefs, and so many assignments of error that in effect, the entire case is presented for our review. We will consider such of the assignments as are material to the disposition of the case in the course of the opinion.

Immediately prior to May 21, 1937, by virtue of ownership of common stock in Apex Oil Corporation and some preferred stock which had voting rights on account of dividends in default, the Potter group had control of Apex. During the early spring of 1937 Rogers Caldwell and Edward Potter, Jr., discussed a trade whereby Rogers Caldwell would secure control of Apex from Potter. Potter refused to deal with Rogers Caldwell in-

dividually, because he was unable to make a satisfactory cash payment for the controlling stock. Rogers Caldwell interested other members of his family in the trade. They incorporated Superior Oil Corporation with authorized capital of $1,000, the statutory minimum, for the sole purpose of handling the Apex trade and the stock of Superior was issued to James E. Caldwell Sons & Company.

To effect the trade with the Potters, 6667 shares of Fourth & First Banks, Inc., stock was loaned to James E. Caldwell Sons & Company, and the latter corporation in turn loaned the same stock to the Superior Corporation, which was the nominal buyer. At the time, the stock stood in the name of Winston Caldwell, but it was actually owned, according to him, by James E. and Meredith Caldwell.

The total purchase price agreed to be paid to the Potters was $285,000 for 1,200 shares of Apex preferred, at $50 per share, and 80,000 shares of Apex common at $2.81¼ per share.

In the trade 5,000 shares of the Fourth & First Banks, Inc., stock were accepted by the Potters at $12 per share, making a down payment of $60,000. The balance of $225,000 was evidenced by various promissory notes and secured by 1667 shares of Fourth & First Banks, Inc., stock, and the Apex stock itself. The Potters had the right to sell the collateral in the event of default in the deferred payments.

Immediately after this sale of the Apex stock the Potters resigned from the Board of Directors of the Apex Oil Corporation, and Rogers, Meredith and James E. Caldwell were elected to the Board and took over the control and operation of that company.

The Apex Oil Corporation was engaged in the business of distribution and sale of oil and gasoline. The oil company from which Apex procured its supply of oil and gas did not permit the resale to independent operators and cut-rate distributors. Therefore, to circumvent this limitation, the Caldwells, with funds of Apex, formed the Barge Oil Company, with a capital stock of 1,000 shares of no par value. The fixed assets of this Corporation were never more than $2,000 or $3,000. There is some controversy about the technical ownership of Barge, as a straw man was set up a president and owner, but we are satisfied from the record that the funds for the incorporation were the funds of Apex and that Barge was completely controlled by the Caldwells as an Apex subsidiary. Apex proceeded to sell to Barge on credit large amounts of oil and gas, so that there was for a time an average monthly balance due from Barge to Apex of more ·than $100,000. The only way that Barge had of repaying Apex was with the money derived from its resales.

In January 1939, when there was a substantial default of more than $60,000 in the deferred purchase price of the Apex stock, James E. Caldwell threatened to repudiate the contract of sale on account of an alleged misrepresentation by Potter of the assets of Apex Oil Corporation. The Caldwells had been in possession and investigation of those assets since May 1937. The Potters proceeded to advertise the collateral for sale on account of default in the deferred payments, and Caldwell had the assets of Apex appraised.

Before the sale of the collateral was held, the parties agreed among themselves to modify the original contract. The 1667 shares of "Fourth & First Banks, Inc.," theretofore held as collateral were accepted by the Potters in

cancellation of $25,000 of the principal debt, and of the accured delinquent interest, and under the modified contract, it was agreed that the balance of the purchase money should be paid off at the rate of $3,000 per month with interest.

On August 19, 1939, eight months after the modified contract was put into effect, Mary E. Holt, a minority stockholder of Apex, filed suit as such minority stockholder in the Chancery Court of Davidson County, to have a receiver appointed for Apex, charging specifically that assets of Apex were being used by the Caldwells to pay the purchase price of the stock which the Caldwells had purchased from the Potters. To support the defendants' resistance to the appointment of a receiver, Edward Potter, Jr., though he was not a party to the cause, made an affidavit for the use of the defendants, in which he strongly advised the Chancellor against the appointment of a receiver. By this affidavit Potter put himself on record as knowing the details of the operation of Apex by the Caldwells and the then financial situation existing between Apex, Barge and Superior. With this affidavit before him, the Chancellor refused to appoint the receiver before the taking of proof.

Notwithstanding the knowledge which Potter evidenced by the affidavit and which he received from the filing of the bill in the *Holt case*, the Potters continued to receive payments out of Apex funds for principal and interest on the deferred balance for the purchase of the Apex stock by the Caldwells. If Potter did not, in fact know, he must be charged with knowledge that the money used to pay for the Apex stock was in fact money of Apex diverted through Barge to Superior. The total amount of monies so diverted was $73,718.05. This is the first item for which the receiver seeks a decree against the defendants.

On May 1, 1939, an issue of first mortgage debentures of Apex, which had been issued prior to the Caldwell operation, in the total amount of $210,000, was matured and were not paid. The Commerce Union Bank, of which Edward' Potter, Jr., was President, owned $100,000 of these debentures. Other debenture holders and preferred stock holders desired to oust the Caldwells and, if necessary, to have a foreclosure for that purpose. Lion Oil Refining Company was anxious to purchase the Apex properties for an amount which would have paid off the debentures in full, as well as paying a substantial amount to the preferred stockholders. If Potter sided with the dissatisfied holders of debentures and stock and aided in the foreclosure, he stood to lose the amount of the deferred purchase money of the Apex stock, which was then not paid. He, therefore, and his action was that of the other members of the Potter group, came to the assistance of the Caldwells and kept them in control of Apex, by lending Apex through the Commerce Union Bank, of which he was President, $50,000 to pay off the debenture holders who would not agree to refund. Though the debentures matured in May, arrangements for the refunding of the debentures were not concluded until August, after the filing of the Holt bill and the affidavit of Potter. At this time Barge owed Apex $112,000 on open account, and Superior owed Barge something more than $50,000. Bearing in mind that the Commerce Union Bank owned $100,000 of the debentures, and that from his affidavit in the Holt suit, Potter knew the financial situation existing between Apex, Barge and Superior, his natural course as President of the Bank, was to require Apex to raise the necessary $52,000 by calling on Barge and Superior, but instead of taking this course which Potter described as "risky" (doubtless since it would jeopardize his chance of receiv-

ing the deferred purchase money for the Apex stock) Apex sold certain wharf property for $23,000, and certain barges for $30,000. With this cash, the Commerce Union Bank was repaid the loan made and used to pay off the debentures held by those refusing to agree to the refunding arrangement. Of course, this transaction required the approval and cooperation of Potter, who was President of the Bank.

The wharf property was sold to W. M. Fuqua for $23,000. Seven months later he resold it to Lion through a corporation which he controlled, at a profit of some $17,000. Use of the wharfage was essential to Apex's operation, and that corporation had to rent the wharf from Fuqua and his transferee for $740 a month. The total amount of rent so paid to Fuqua or his corporation, was $4,440. The rent paid and the profit made on the resale to Lion aggregated $21,440. This is the second item for which recovery is sought by the receiver in this cause.

One of the large customers of Barge Oil Company was the Red Ace Petroleum Company, which owned a chain of filling stations and was engaged in the distribution and sale of gas and oil. In September 1937, in consideration of a long term contract to furnish gas and oil to Red Ace, the Caldwells acquired in the name of Barge ½ the stock of this corporation. Thereafter, in January 1940, by vote of the stockholders, the charter of Red Ace was amended to authorize the issuance of 1,000 shares of preferred stock. On January 23, 1940, Rogers, Meredith and Meredith Caldwell, Jr., were elected to the Board of Directors of Red Ace, and on the same day the new board of directors authorized the President of Red Ace to settle its debt to Barge with preferred stock. On February 7, 1940, Barge accepted 600 shares of this preferred stock valued

for the trade, at $45,000 in settlement of the debt which Red Ace owed Barge in the sum of $46,075.86. On February 17, 1940, Barge transferred this Red Ace preferred stock to Apex to secure a credit of $45,000 on the debt which Barge owed Apex. The receiver has filed a separate suit against Red Ace to set aside this transaction and to secure a judgment against Red Ace for $45,000, and any recovery by the receiver in the other case, will be a credit on the judgment for the $45,000 in this case. The receiver has tendered the Red Ace stock into the Chancery Court, and upon a satisfaction of the judgment, the Chancellor will dispose of the stock on equitable principles. Clearly, the use of this preferred stock of Red Ace to reduce the indebtedness of Barge to Apex was a part of the scheme to defraud and was clearly an irregular and unlawful cancellation of $45,000 of the debt owed Apex by Barge. Both the Chancellor and Court of Appeals have so held.

The next item on which recovery is sought by the bill of the receiver is the sum of $65,773.05, which is made up of sums of money drawn as salaries by the individual Caldwells during their operation of the Apex Oil Corporation. During the time Rogers Caldwell drew $36,915.06, Meredith Caldwell $16,401.99, and James E. Caldwell $12,056. The balance of this item is the sum of $400 which was paid out of the assets of Barge to an attorney employed by James E. Caldwell to advise Superior at the time of the modified contract in January 1939.

█ . The Courts below have concurred in finding that the only service that the Caldwells rendered Apex was the wrecking of that Corporation by misappropriation of its corporate assets for their personal benefit. Therefore, under well-settled law, they were not entitled to salaries during the time of their control, Fletcher Cyc. Corp.,

Perm. Ed., Vol. V, Ch. 16, sec. 2145, and their division of the spoils is to be disregarded. *Brumley* v. *Speedway & Motordrome Co.*, *infra.* Each of the Caldwells is liable for the entire amount of salaries wrongfully withdrawn from the assets of Apex.

The lower Courts have concurred in holding the individual Caldwells liable on the items of $73,718.05 and $45,000, so the question of their liability for those items is here foreclosed.

█ Bearing in mind that we are considering, so far as the Caldwells and the Caldwell Corporations are concerned, the question of liability on account of fraud and fraudulent design, it is clear that since the executive officers and directors of the Caldwell Corporations were the same as the individual Caldwells, the design and intent of the corporation cannot be distinguished from the design and intent of the individual. Further, the testimony of Winston Caldwell, who was Secretary-Treasurer of all three corporations, about the bookkeeping, loans, issuance of stock, etc., fully justifies a finding that there was not even a formal separation and distinction in the operation of the three companies. Little question is made of the liability of any of the Caldwell corporations except James E. Caldwell & Company. From the fact that James E. and Meredith Caldwell had the absolute and unquestioned executive control both of James E. Caldwell & Company and James E. Caldwell Sons & Company, we can not find a reasonable basis for distinguishing liability on the charge here of fraud and fraudulent liability. Documents which were issued and transactions that were had in the early days of the Caldwell operation of Apex when there was still probability that the purchase of Apex might result successfully, conclusively show that these officers, themselves, made no distinction. James E. Caldwell & Com-

pany paid the Potter interest on the Apex stock and after the nominee was withdrawn, the Barge stock was issued to James E. Caldwell & Company. It was later insisted that this was a mistake and that the stock should have been issued to James E. Caldwell Sons & Company. Of itself this shows that no clear separation was made of the operation of the two corporations. Other instances could be added but it is sufficient to point out that by the loans which James E. Caldwell & Company made to Apex from time to time when, of course, Meredith and James E. Caldwell knew all details of the operation and its fraudulent function, convicts James E. Caldwell & Company of aiding and abetting the fraud. So far as the Apex purchase and operation are concerned, James E. Caldwell Sons & Company and James E. Caldwell & Company are an "entity." *Knox County* v. *Fourth & First Nat. Bank*, 181 Tenn. 569, 583, 182 S. W. (2d) 980.

All stock of Superior was owned by James E. Caldwell Sons & Company, and all stock of James E. Caldwell Sons & Company was owned by James E. Caldwell & Company. The directors and officers of all corporations were the same individuals except that Rogers Caldwell was a director of Superior only. The misfeasance of their executive officers and directors, under the facts here, makes both corporations liable.

". . . . here are two corporations under the same management and control, so that in all matters affecting the two the action of one is the action of the other. The fraud of the one becomes the fraud of the other." *Madison Trust Co.* v. *Stahlman*, 134 Tenn. 402, 421, 422, 183 S.W. 1012, 1017.

Whether the liability be fixed under the Doctrine of Responsibility of Majority Stockholders, *Southern Pac.* v. *Bogart*, 250 U. S. 483, 39 S. Ct. 533, 63 L. Ed. 1099; *Pep-*

*per* v. *Litton*, 308 U. S. 295, 60 S. Ct. 238, 84 L. Ed. 281, or under the instrumentality doctrine, *McDonald, Shea & Co.* v. *Charleston, C. & C. R. Co.*, 93 Tenn. 281, 24 S. W. 252; *Madison Trust Co.* v. *Stahlman*, 134 Tenn. 402, 183 S. W. 1012; *Dillard & Coffin Co.* v. *Cotton Oil Co.*, 140 Tenn. 290, 204 S. W. 758; *Fidelity Trust Co.* v. *Service Laundry Co.*, 160 Tenn. 57, 22 S. W. (2d) 6, the result is the same.

██ On the present record the conclusion is fortified by the failure or refusal of James E. Caldwell and Meredith Caldwell to testify. Both of these members of the "Caldwell Group" were active participants in the entire operation of defrauding the stockholders and creditors of Apex by the wrongful withdrawal and dissipation of its assets. Testimony of the other witnesses showed that James E. Caldwell had personally brought about the appraisal of the assets of Apex in January 1939, and secured the modification of the original contract, and that Meredith Caldwell had been actively engaged in the entire operation of Apex under the Caldwells. The allegation that James E. and Meredith Caldwell individually owned the Fourth & First Banks, Inc., stock with which the Apex trade was made, would have been more credible if they, themselves, had testified to the fact. James E. Caldwell and Meredith Caldwell were specifically charged with fraud and misappropriation of the assets of Apex. The receiver's proof clearly made a *prima facie* case against them. *Davis* v. *Auto Tire & Vulcanizing Co.*, 141 Tenn. 527, 213 S. W. 914. We think, therefore, that their failure to testify clearly created a presumption against them, as well as against their corporations. The Court of Appeals so held under rules made in *State ex rel. Davis* v. *Kivett*, 180 Tenn. 598, 177 S. W. (2d) 551; *Fisher* v. *Insurance Co.*, 124 Tenn. 450, 138 S. W. 316, Ann. Cas. 1912D, 1246.

In considering the liability of the Potters, the record fully justifies a holding, and we hold, that the actions of Edward Potter, Jr., bound all members of the "Potter Group." A number of facts prevent a conclusion that the relation of the Potters and Caldwells in the sale of the Apex stock to Superior, was merely that of seller and buyer in a business transaction where dealing was at arms-length. (1) The Caldwells wanted to buy the control of Apex, therefore, it was the voting strength and not whether the stock was common or preferred that was important. On account of delinquent dividends, each share of preferred stock represented 26 votes and each share of common 1 vote. In May 1937, the stock holders of Apex, on account of the ownership of 107,000 shares of common and 4,022 shares of preferred stock, had a total of 211,572 votes. The sale to the Caldwells was equivalent to a sale to them of 111,200 votes. Some two weeks before closing the trade with the Caldwells, Potter bought a large block of Apex common stock from the Commerce Union Company, paying $1 a share, and having the stock issued in his wife's name. The 28,333 shares of common stock, or 28,333 votes, so bought, represented the control of Apex which Potter had to acquire to meet his contract with the Caldwells. Without these shares he had 82,867 votes which were 12,919 less than 50% and considerably less than control. Since the purchase price from the Commerce Union Company was $1 a share for the common stock, argument that such stock when it represented control, was worth $2.81¼ a share, is not supported by the record, and is refuted thereby.

The only reasonable explanation of the excessive price in the Caldwell trade is that for the Potters, a deal with the Caldwells, on account of their reputation and record, was hazardous, and for the Caldwells, the exces-

sive price was acceptable because they did not expect to pay it out of their own money. And this latter fact, Potter was bound to know from the details of the trade and the surrounding circumstances. We find that the selling price to the Caldwells through Superior was so far in excess of the market in May 1937, as to constitute a badge of fraud. *McElya* v. *Hill*, 105 Tenn. 319, 328, 59 S. W. 1025; *Insuran-shares Corporation* v. *Northern Fiscal Corporation, D. C.*, 35 F. Supp. 22; *Gerdes* v. *Reynolds*, Sup. Ct., 28 N. Y. S. (2d) 622.

■ (2) The very sale itself, giving a credit of $225,000 to the Superior Corporation, which had no credit and no assets, is the strongest indication that the Potter Group in May 1937, expected to secure the deferred purchase money from some source other than the buyer. There is no evidence that the stock sold was in May 1937, worth the amount of the deferred purchase money, so that the retention of the stock as collateral does not meet the issue. We think that if the sale had been made in reliance on the Caldwells' credit, that beyond a doubt the seller would have insisted that the sale be made to James E. Caldwell & Company. That corporation was the only member of the Caldwell Group that had the necessary credit and that corporation was incorporated to do the type of business that the sale of Apex stock represented. The only reasonable inference that we can draw from all the evidence surrounding the sale by Potter to the Caldwells is that he expected to be paid the deferred purchase money from the assets of Apex first by its profitable operation, and when that hope was not realized, he was willing to receive the deferred payments from capital assets which he knew had been misappropriated.

■ (3) Potter, prior to May 1937, had been not only a large stockholder, but the controlling executive of Apex.

From January-May 1937, the office of President was vacant, but Potter discharged the functions of the office. Not only as an officer and director, but as controlling stockholder, he owed a fiduciary duty to other stockholder" and creditors of Apex. *Southern Pac.* v. *Bogart, supra.* As president of one of the largest banks in Nashville, and as one of that City's leading business executives, his testimony that he did not know the reputation and record of the Caldwells for frenzied corporate finance and ruthless sacrifice of minority stockholders, is simply impossible for this Court to believe. Where the testimony of an interested witness is incredible in the light of common knowledge and other circumstances, this Court is not bound to accept it. *Carter* v. *Kelsey Wheel Co.,* 168 Tenn. 262, 77 S. W. (2d) 449. Cf. *Southern R.* v. *Hutson,* 170 Tenn. 5, 91 S. W. (2d) 290. The excessive purchase price paid Potter and members of his family for the Apex stock is the only reasonable explanation for the sale to the Caldwells, and a desire to collect the full price, regardless of the source of the payments made, is the only reasonable explanation for Potter's later actions..

(4) He agreed to the modification of the contract in January 1939, because he realized that sale of the collateral would not bring the balance due.

(5) He made the affidavit for the Caldwells to prevent the appointment of a receiver in the Holt suit because a receivership would leave his claim for the balance of the purchase price of the Apex stock uncollectible, and as we have held, his undertaking to advise the Chancellor not to appoint a receiver charges him with knowledge of the financial condition of Barge and Apex and the source of the money paid by Superior to Temple.

(6) Since any attempt to force Barge to pay its debts to Apex would have stopped the milk-run through Superi-

or to Temple, he came to the assistance of the Caldwells and had the Commerce Union Bank make the loan necessary to meet demands of dissatisfied holders of debentures, and so keep the Caldwells in control of Apex.

The Chancellor held that there was no conspiracy between the Caldwell and the Potter Groups. The Court of Appeals held the contrary. We find that the preponderance of the evidence on careful study of the long record, supports the Court of Appeals. Of course, when the sale of Apex stock was made to the Caldwells in May 1937, no one could foresee what cooperation by the Potters would be necessary to enable them to collect the selling price and keep the Caldwells in control of Apex, but using the record to trace back from the appointment of a receiver in 1940, to the installation of the Caldwells in 1937, whenever cooperation or assistance was necessary to meet the deferred installments of purchase money or to keep the Caldwells in control, the Potters, through Edward Potter, Jr., supplied the cooperation and assistance in full measure. The inference is justified that from May 1937 Potter conspired to transfer control of Apex to the Caldwells for the diversion of its assets for personal profit, but even if Potter became active in the conspiracy only after the Holt suit, the Potter Group is liable for all damages to Apex by the conspiracy. 12 C. J., Conspiracy, Sec. 181; 15 C. J. S., Conspiracy, Sec. 19, and numerous cases there cited, including *Calcutt* v. *Gerig,* 6 Cir., 271 F. 220. Compare *Tennessee Pub. Co.* v. *Fitzhugh,* 165 Tenn. 1, 52 S. W. (2d) 157.

The lower Courts have concurred in holding the individual Caldwells guilty of fraud. The Chancellor did not use the word "fraud" in his opinion, but he did find the Caldwells guilty of actions that were fraudulent beyond peradventure:

"The Barge Corporation made loans to Superior for the purpose of the latter corporation making deferred payments on the Apex stock purchased by Superior, for the Caldwells. At the time these loans were made by Barge, it was indebted to Apex, and the money it was lending Superior to buy stock for the Caldwells, should have been paid to Apex on its account. James E. Caldwell Sons & Company had knowledge of these transactions, and through its officers participated in them. As a result of these loans, Apex was the ultimate loser to the extent of $73,718.05."

"Unquestionably Meredith Caldwell realized the plight of Apex, and knew that with its failure Barge would be unable to continue its operations. Seeing the handwriting on the wall, Meredith Caldwell took steps to liquidate the Barge corporation, and attempted to get it in a condition whereby the River Terminal Company could take over its good will and business without its liabilities.

"In furtherance of this plan, Meredith Caldwell, who actually controlled Barge, entered into an agreement for the Red Ace account of $46,075.86 to Barge, to be liquidated in (by) acceptance of 600 shares of preferred stock in the Red Ace. In order to carry out this scheme, Rogers Caldwell, Meredith Caldwell, Sr., and Meredith Caldwell, Jr., were put on the Board of Directors of Red Ace. This was done on January 17, 1940, and on the same day Meredith Caldwell, Senior and Junior, were elected vice presidents of Red Ace.

"On February 6, 1940, Red Ace issued 600 shares of its preferred stock to Barge in cancellation of its $46,075.86 debt.

"On February 19, 1940, this preferred stock which had been issued to Barge, was turned over to Apex Oil Corporation in satisfaction of $45,000.00 of Barge's indebtedness to Apex, and on the same day the Caldwells had Apex

90

give Barge a credit of $78,000.00 on the ground that Apex had been overcharging Barge for gasoline during 1937-38."

 Therefore, by the concurrent finding of the Chancellor and the Court of Appeals, the question of fraud on the part of the individual Caldwells is foreclosed here and we find that the preponderance of the evidence disclosed a knowing and intentional participation of the "Potter Group" in the fraud. 15 C. J. S., Conspiracy, Sec. 2. Of course the evidence is largely circumstantial, but it.is based on records made by the defendants themselves. This is sufficient proof of conspiracy. 11 Am. Jur., Conspiracy, p. 585, sec. 56; 15 C. J. S., Conspiracy, Sec. 29.

"A 'civil conspiracy' may be defined to be a combination between two or more persons to accomplish by concert an unlawful purpose or to accomplish a purpose not in itself unlawful by unlawful means. *McKee* v. *Hughes*, 133 Tenn. 455, 181 S. W. 930, L. R. A. 1916D, 391 [Ann. Cas. 1918A, 45].

. . . . . . . . .

"A 'conspiracy to defraud' on the part of two or more persons means a common purpose, supported by a concerted action to defraud, that each has the intent to do it, and that it is common to each of them, and that each has the understanding that the other has that purpose. *Ballantine* v. *Cummings*, 220 Pa. 621, 70 A. 546, citing *United States* v. *Frisbie*, C. C., 28 F. 808. The agreement need not be formal, the understanding may be a tacit one, and it is not essential that each conspirator have knowledge of the details of the conspiracy. *Patnode* v. *Westenhaver*, 114 Wis. 460, 90 N. W. 467.

. . . . . . .

"Since it is basic principle that each conspirator is responsible for everything done by his confederates which

the execution of the common design makes probable as a consequence, the law applying no gauge to ascertain relative activity in the production of that consequence, it follows that each is liable for all damages, naturally flowing from any wrongful act of a coconspirator in carrying out such common design. *Boston* v. *Simmons,* 150 Mass. 461, 23 N. E. 210, 6 L. R. A. 629, 15 Am. St. Rep. 230; 5 R. C. L., 1104. The rule is conformable to the principle that each joint tort-feasor is liable for the entire damage.

"This is true despite any distribution that may have been made, by way of payments or otherwise, by conspirators of the booty gathered as a result of their wrongdoing. *Zinc Carbonate Co.* v. *Shullsburg, etc., Bank, supra,* [103 Wis. 125, 79 N. W. 229, 74 Am. St. Rep. 845]; *People* v. *Tweed.* 5 Hun. (N. Y.) 353; *Fountain Springs Park Co.* v. *Roberts,* 92 Wis. 345, 66 N. W. 399, 53 Am. St. Rep. 917. The law itself makes no apportionment, and it disregards any distribution made by the conspirators themselves, and refuses to consider same when urged as a shielding or mitigating equity." *Brumley v. Speedway & Motordrome Co.,* 138 Tenn. 534, 538, 539, 540, 198 S. W. 775, 776.

Applying the foregoing principles to the case before us, the decrees of the lower Courts will be modified as follows:

(1) The bill will be dismissed as to Mrs. Myra J. Blair and Mrs. Lollie Evans.

(2) A decree will be entered for the items of $73,718.05 and $45,000 against all the remaining defendants.

(3) The judgment of the Court of Appeals is modified and a decree for $65,773.05 will be entered against all the

defendants of the Caldwell Group, including James E. Caldwell & Company. *Brumley* v. *Speedway & Motordrome Co., supra.*

(4) As to the item of $21,440, we think the lower Courts were clearly correct in denying recovery for the profit on resale amounting to $17,000, but we think that for the item of $4,440, representing rent actually paid out of the assets of Apex, recovery should be allowed against all defendants of both Caldwell and Potter groups. To this extent the judgment of the Court of Appeals is modified.

(5) As to interest on the judgments, this Court has upheld the rule that where judgments stem from fraud, they bear interest at the legal rate of 6 percent *per annum* from the accrual of the cause of action. *Nolen* v. *Witherspoon*, 182 Tenn. 333, 187 S. W. (2d) 19; *Cannon* v. *Apperson*, 82 Tenn. 553, 581. Compare 45 Am. Jur., Receivers, sec. 265, p. 204.

The burden was on the defendants to establish matters in reduction or mitigation of the amount of damages, including the award of interest. 15 Am. Jur., Damages, sec. 329, p. 769; *United States* v. *Behan*, 110 U. S. 338, 346, 4 S. Ct. 81, 28 L. Ed. 168; *Holt* v. *United Security Life Ins. & Trust Co.*, 76 N. J. L. 585, 72 A. 301, 21 L. R. A., N. S., 691, 697; *International Correspondence School, Inc.*, v. *Crabtree*, 162 Tenn. 70, 78, 34 S. W. 2d 447, 78 A. L. R. 330. In the record here, we find no evidence of matters that would induce us to modify the rule made in *Cannon* v. *Apperson, supra.* However, since the cause of action accrued when the receiver was appointed on March 27, 1940, and suit was not brought until July 30, 1941, we think that interest at 6% *per annum*

should be allowed on the judgment from and after the date on which the original bill was filed.

(6) The defendants will pay the costs of the cause.

So modified, the judgment of the Court of Appeals is affirmed.

All concur.